OPINION OF THE COURT
Skelos, J.E
The office of the Queens County District Attorney (hereinafter the District Attorney’s office) instituted a program (hereinafter the Program) under which arrested individuals are systematically interviewed just prior to arraignment, or, in other words, immediately before those individuals’ indelible right to counsel would attach. As part of the Program, the District Attorney’s office formulated a script, containing a number of statements, which is read to suspects before they are advised of their constitutional rights as required under Miranda v Arizona (384 US 436 [1966]). The principal issue presented on this appeal is whether this procedure is effective to secure those individuals’ fundamental constitutional privilege against self-incrimination and right to counsel. We hold that it is not, and, therefore, that the defendant’s videotaped statement, made to members of the District Attorney’s office pursuant to the Program, should have been suppressed.
On April 23, 2009, at 12:40 p.m., the complainant was working as the only cashier at a small commercial establishment that provides money-transfer and other services. A customer entered the store, made some photocopies, and then exited the store. About five minutes later, the customer returned and knocked on the store’s locked outer door. The complainant, who was sitting at a counter behind a locked door and a plexiglass barrier, opened the outer door with a button located at the counter. The customer entered, displayed what appeared to be a gun, and demanded money. The complainant got down on the floor behind the counter and called 911, after which, the perpetrator left. The complainant was still lying on the ground when the perpetrator left, and did not see whether the perpetra *201 tor fled on foot or in a car. She described the perpetrator as a thin, black man who wore a blue and white striped shirt and a hat.
According to pretrial hearing testimony, Police Officer Frank Diliberto and his partners received a radio call related to this incident, which included a description of a getaway vehicle as a black livery cab with New Jersey license plates. Approximately three minutes later, the police officers stopped a black livery cab, which was occupied by one passenger — the defendant — and a driver, whom a police officer described, at trial, as a dark-skinned, Hispanic man. At that time, the defendant was wearing jeans and a black t-shirt. Officer Diliberto removed the defendant from the vehicle and placed him in handcuffs. According to Officer Diliberto, he then found a black “Yankee hat,” a black “handgun,” which turned out to be an air pistol, and a blue and white striped shirt, “on the floor of the black livery on the back seat.” Officer Diliberto later clarified that he found these items “directly on the floor in front of the seat” or “[d]irectly behind the driver’s seat, on the floor of the vehicle.”
Police Officer Peter Linke arrived at the location where the livery cab had been stopped when the defendant was already in handcuffs. Officer Linke saw Officer Diliberto remove the hat, gun, and blue and white striped shirt from the car. When Officer Linke was confronted at the pretrial hearing with his grand jury testimony that he saw Officer Diliberto remove the items from “under the passenger seat in the front,” Officer Linke indicated: “If that’s what I said, that’s correct.”
Shortly after the livery cab was stopped, a police officer brought the complainant to the location of the stopped vehicle, where she viewed the defendant, who was in handcuffs and surrounded by uniformed police officers. Officer Diliberto was standing next to the defendant and holding the striped shirt at the height of his waist, such that the complainant saw the shirt when viewing the defendant. The complainant identified the defendant as the perpetrator. The defendant was then taken to the police precinct. The time of the defendant’s arrest was 12:59 p.m. on April 23, 2009.
About 23 hours later, on April 24, 2009, at 12:03 p.m., Sergeant Mary Picone brought the defendant from the “pens,” where he was waiting to be arraigned before a judge, to an interview room to be questioned by herself and Assistant District Attorney (hereinafter ADA) Tina Grillo. As revealed by the recording of the interview, once the defendant was brought *202 to the interview room, Sergeant Picone and ADA Grillo introduced themselves, and ADA Grillo informed the defendant that, “when [he goes] to court,” he would be charged with, among other stated offenses, attempted robbery in the first degree and criminal possession of a weapon in the fourth degree, related to an incident that had occurred the previous day in Queens County at the above-referenced store. In accordance with the Program, Sergeant Picone informed the defendant that “in a few minutes” she would read him his Miranda rights, and that he would “be given an opportunity to explain what [he] did and what happened at that date, time, and place.” Sergeant Pi-cone then instructed the defendant as follows:
“If you have an alibi, give me as much information as you can, including the names of any people you were with.
“If your version of what happened is different from what we’ve been told, this is your opportunity to tell us your story. If there is something you need us to investigate about this case you have to tell us now so we can look into it.
“Even if you have already spoken to someone else you do not have to talk to us.
“This will be your only opportunity to speak with us before you go to court on these charges.” (These statements will be hereinafter referred to as the preamble.)
Sergeant Picone explained to the defendant that the interview was being recorded, advised him of his right to be arraigned without undue delay, and then read him the Miranda warnings. The defendant indicated his understanding of each warning, after which, Sergeant Picone asked the defendant if he would answer questions. The defendant replied “yes,” and Sergeant Picone asked the defendant “what happened.”
The defendant stated that he had met a man named Pete, who had told him “about robbing this place.” The defendant believed that “the money” was under the counter and indicated that he was supposed to scare the cashier by showing her the fake gun, which he had gotten from Pete. Sergeant Picone and ADA Grillo asked the defendant a number of questions about the incident, such as how the defendant got to the location of the crime and what kind of gun he used.
The defendant twice interrupted the questioning to express his confusion or concern as to how the interview was helping *203 him. Sergeant Picone responded that the questioning was “beneficial to [him] if [he had] an alibi, [or] if there’s something we need to investigate about this.” Sergeant Picone and ADA Grillo also explained that the defendant could tell them something that might benefit him, such as “it wasn’t me, I wasn’t there.” When the defendant stated that he could not truthfully say that it was not him, Sergeant Picone immediately responded: “No, you can’t say that because we have pictures of you and they found the BB gun and all that stuff.” At that point, ADA Grillo began questioning the defendant about who picked him up after the incident.
The defendant then asked if he would be talking to “the D.A.” after he was finished talking to ADA Grillo and Sergeant Pi-cone, to which they responded that the next person he would be talking to was his lawyer. ADA Grillo and Sergeant Picone explained that it was their job to determine if there was anything the defendant needed them to investigate and to find out from him what his side of the story was. The defendant stated that his side of the story was that he felt that he was forced by Pete and “Ralphy” (the driver who picked him up after the incident) to rob the store. ADA Grillo and Sergeant Pi-cone then asked a few more questions about the details of the incident before concluding the interview.
The defendant was subsequently indicted on charges of attempted robbery in the second degree, criminal mischief in the fourth degree, menacing in the third degree, and unlawful sale or possession of an imitation pistol. Prior to trial, the defendant moved, inter alia, to suppress the physical evidence taken from the cab, the showup identification, and his videotaped statement. The Supreme Court denied the motion, concluding that the physical evidence was properly seized because it was observed by Officer Diliberto in plain view, and that the showup procedure was not unduly suggestive. With respect to the defendant’s videotaped statement, the Supreme Court determined that the defendant had knowingly and voluntarily waived his constitutional rights prior to making a statement and that he made the statement voluntarily.
At trial, the People presented the complainant’s testimony as to the circumstances of the attempted robbery and the showup identification. The complainant also identified the defendant in court as the perpetrator. Additionally, Police Officer Daniel Banning, who was working with Officer Diliberto on the day of the incident, testified about the vehicle stop, and the recovery of the *204 physical evidence, which he stated was found by Officer Diliberto in the back seat behind the driver’s seat, “right where [the defendant’s] feet would be.” In contrast, Officer Linke testified that Officer Diliberto recovered the physical evidence from underneath the front passenger seat. The People further offered Sergeant Picone’s testimony to lay the foundation for the recording of the prearraignment interview, which was played for the jury.
Based upon this evidence, the jury convicted the defendant of attempted robbery in the second degree and criminal mischief in the fourth degree. The defendant was sentenced, as a persistent violent felony offender, inter alia, to an indeterminate term of imprisonment of 17 years to life upon his conviction of attempted robbery in the second degree.
On appeal, the defendant contends, among other things, that his videotaped confession should have been suppressed because it was obtained in violation of the dictates of Miranda. We agree, and because this error was not harmless beyond a reasonable doubt, we reverse the judgment of conviction.
It is “an underlying principle in the enforcement of our criminal law[ ] that ours is an accusatorial and not an inquisitorial system” (Rogers v Richmond, 365 US 534, 541 [1961]; see People v Anderson, 42 NY2d 35, 37 [1977]). Under our accusatorial system, “society carries the burden of proving its charge against the accused not out of his own mouth . . . but by evidence independently secured through skillful investigation” (Watts v Indiana, 338 US 49, 54 [1949]; see People v Anderson, 42 NY2d at 37). Embodying that principle, the Fifth Amendment to the United States Constitution guarantees that “[n]o person shall be . . . compelled in any criminal case to be a witness against himself” (US Const Amend V; see Miranda v Arizona, 384 US at 460; Brown v Walker, 161 US 591, 597 [1896]). The same privilege is afforded under the New York Constitution (see NY Const, art I, § 6).
Prior to the United States Supreme Court’s decision in Miranda, the admissibility of a suspect’s confession was evaluated solely under a voluntariness test principally derived from the Due Process Clause of the Fourteenth Amendment (see Dickerson v United States, 530 US 428, 433-434 [2000]; see e.g. Haynes v Washington, 373 US 503, 513 [1963]; Lynumn v Illinois, 372 US 528, 534 [1963]). Under that test, courts examined whether “ ‘a defendant’s will was overborne’ ” by the totality of the circumstances surrounding the giving of a confession (Dickerson v *205 United States, 530 US at 434, quoting Schneckloth v Bustamonte, 412 US 218, 226 [1973]; see e.g. Haynes v Washington, 373 US at 513; Lynumn v Illinois, 372 US at 534; People v Mateo, 2 NY3d 383, 413 [2004], cert denied 542 US 946 [2004]; People v Anderson, 42 NY2d at 41; People v Aveni, 100 AD3d 228 [2012]; People v Carey, 67 AD3d 925 [2009]). Post-Miranda, confessions that are deemed to be involuntary under this standard are still excluded from evidence (see Dickerson v United States, 530 US at 434; see e.g. People v Anderson, 42 NY2d at 41; People v Aveni, 100 AD3d 228 [2012]; cf. CPL 60.45; see generally People v Mateo, 2 NY3d at 413). However, in Miranda, the United States Supreme Court concluded that this “ ‘traditional totality-of-the-circumstances’ ” test was insufficient to adequately protect an individual’s Fifth Amendment privilege in the context of custodial interrogations due to the compulsion inherent in the custodial environment (Missouri v Seibert, 542 US 600, 608 [2004], quoting Dickerson v United States, 530 US at 435-437; see Miranda v Arizona, 384 US at 457). In that respect, the Court determined that, “[u]nless adequate protective devices [were] employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from [a] defendant [could] truly be the product of his free choice” (Miranda v Arizona, 384 US at 458). The Court, accordingly, held that “the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination” (id. at 444 [emphasis added]).
The Miranda Court rejected “the more extreme position” that the required procedural safeguard was the presence of an attorney during all custodial interrogations (Moran v Burbine, 475 US 412, 426 [1986]). Rather, the Court concluded that custodial interrogation could continue “in its traditional form . . . but only if the suspect clearly understood” his or her relevant constitutional rights (Moran v Burbine, 475 US at 426 [emphasis added]; see Miranda v Arizona, 384 US at 467). Thus, the procedural safeguards mandated by the Supreme Court are the now familiar “Miranda warnings”: Prior to any questioning, suspects must be warned that they have a right to remain silent, that anything they say can and will be used against them in a court of law, that they have the right to the presence of an attorney prior to and during the course of questioning, and that if they cannot afford an attorney one will be appointed for them *206 prior to any questioning (see Miranda v Arizona, 384 US at 444, 479; People v Hutchinson, 59 NY2d 923 [1983]; People v Rodney P. [Anonymous], 21 NY2d 1, 3-4 [1967]; see also People v Paulman, 5 NY3d 122, 130 [2005] [the “New York courts have embraced the (Miranda) rule as consistent with article I, § 6 of the New York Constitution”]).
After these warnings have been given, a defendant may waive the constitutional rights identified therein (see Moran v Burbine, 475 US at 421; Miranda v Arizona, 384 US at 479; People v Williams, 62 NY2d 285, 287-288 [1984]). However “a heavy burden rests on the government” to demonstrate that the defendant’s waiver was knowing, intelligent, and voluntary (Miranda v Arizona, 384 US at 475; see Missouri v Seibert, 542 US at 608 n 1; People v Davis, 75 NY2d 517, 523 [1990]). In order to meet that burden, it must be shown, inter alia, that the waiver was made with “a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it” (Moran v Burbine, 475 US at 421; see Berghuis v Thompkins, 560 US —, —, 130 S Ct 2250, 2260 [2010]).
While the courts have held that Miranda warnings need not “be given in the exact form described in that decision” (Duckworth v Eagan, 492 US 195, 202 [1989]), where there is deviation from the form prescribed in Miranda, courts must inquire “whether the warnings reasonably ‘ conve[yed] to [a suspect] his rights’ ” (Duckworth v Eagan, 492 US at 203, quoting California v Prysock, 453 US 355, 361 [1981]; see Florida v Powell, 559 US —, —, 130 S Ct 1195, 1204 [2010]; People v Louisias, 29 AD3d 1017 [2006]; People v Parker, 258 AD2d 479 [1999]; People v Bartlett, 191 AD2d 574 [1993]; People v Thomches, 172 AD2d 786 [1991]; People v Lewis, 163 AD2d 328 [1990]). In these cited cases, the courts held that, despite various minor deviations from the prescribed form, the suspect’s rights were adequately conveyed to him or her, as required by Miranda (see Florida v Powell, 559 US at —, 130 S Ct at 1204-1205 [suspect told that he had “the right to talk to a lawyer before answering any . . . questions,” and that he could invoke that right “at any time . . . during th(e) interview,” but not explicitly that he had the right to the presence of an attorney during questioning]; Duckworth v Eagan, 492 US at 197, 198 [suspect told that he could have a lawyer with him during questioning, and if he could not afford a lawyer, one would be appointed “if and when (he went) to court” (emphasis omitted)]; California v Prysock, 453 US at 358 [defendant told he had the right to counsel before and dur *207 ing questioning, and a right to appointed counsel, but not explicitly that counsel could be appointed before questioning]; People v Bartlett, 191 AD2d at 575 [defendant told that he had the right to “keep silent until (he had) a chance to talk with a lawyer”]; People v Thomches, 172 AD2d at 787 [inquiry, after full warnings, as to whether the defendant was willing to answer questions did not include the phrase “(w)ithout an attorney present”]; People v Lewis, 163 AD2d at 328 [same]; cf. People v Hutchinson, 59 NY2d 923, 924 [1983] [inculpatory statement should have been suppressed where defendant was not told that he was entitled to the assistance of counsel “during his questioning by the officer”]; People v Bracero, 117 AD2d 740 [1986] [same]).
In contrast to these cases, which involved minor deviations from the prescribed language of the Miranda warnings, the preamble formulated by the District Attorney’s office adds information and suggestion to the Miranda warnings which prevent them from effectively conveying to suspects their rights. Miranda mandates that suspects be informed of their rights in “clear and unequivocal terms” (Miranda v Arizona, 384 US at 467-468). When the clear and unequivocal warnings devised in Miranda are combined with the information and suggestion contained in the preamble, the message conveyed to suspects is muddled and ambiguous. Correspondingly, when the warnings are combined with the preamble, it cannot be said with assurance that the suspects clearly understood their rights.
More specifically, suspects interviewed pursuant to the Program are advised of their Fifth Amendment privilege against self-incrimination, but only after being told that this is their “opportunity,” and then “only opportunity,” to, essentially, refute what the prosecutor has been told by other individuals, to correct any misperceptions or falsehoods, and to try to help themselves.[1] Significantly, this “opportunity,” with which suspects are presented, is to speak, not merely with a police detective, but with an ADA — “the one person who can [at the prearraignment] stage plausibly assert authority to grant favorable treatment to an uncounseled defendant” (United States v *208 Duvall, 537 F2d 15, 24 [2d Cir 1976], cert denied 426 US 950 [1976], and cert denied sub nom. Jones v United States, 426 US 950 [1976]). This fact makes “rigorous enforcement of Miranda peculiarly necessary” (id.).
The preamble also suggests a sense of immediacy and finality which impairs suspects’ reflective consideration of their rights and the consequences of a waiver. By advising suspects: “[i]f there is something you need us to investigate about this case you have to tell us now so we can look into it,” the preamble suggests that the prosecutor will not investigate their version of events if the suspects decline to speak with the prosecutor at that time. Concomitantly, this advisement suggests that the prosecutor will assist the suspects by performing such an investigation, if the suspects agree to be interviewed. Such a suggestion is contrary to the very purpose of the warning that anything a suspect says can be used against him or her, namely, to “make the individual more acutely aware that he is faced with a phase of the adversary system — that he is not in the presence of persons acting solely in his interest” (Miranda v Arizona, 384 US at 469).
In essence, although suspects interviewed pursuant to the Program are told, through the Miranda warnings, that they have the right to remain silent, the preamble suggests that invoking that right will bear adverse, and irrevocable, consequences. Such a suggestion conveys that suspects have a right to remain silent only in the most technical sense. While the Miranda warnings also advise suspects interviewed pursuant to the Program that anything they say can and will be used against them in court, the preamble essentially suggests that anything they say will also be used to help them. Therefore, the procedure followed under the Program is not “effective to secure the privilege against self-incrimination” (id. at 444).
Furthermore, both the United States Supreme Court and the New York Court of Appeals have acknowledged, in different factual contexts, that the conduct of an interrogation can render the Miranda warnings insufficient to secure a suspect’s rights, and vitiate a knowing waiver of those rights (see Missouri v Seibert, 542 US at 611; People v Paulman, 5 NY3d at 130; People v Bethea, 67 NY2d 364, 367 [1986]; People v Chapple, 38 NY2d 112, 115 [1975]). Specifically, in Missouri v Seibert, the United States Supreme Court concluded that statements given pursuant to a police protocol under which the police would deliberately interrogate a suspect without giving Miranda warnings, obtain *209 a statement, then administer the warnings and re-elicit the statement, were inadmissible (Missouri v Seibert, 542 US at 604). Although the Miranda warnings were, in fact, recited, the plurality of the Court concluded that, under that protocol, the warnings could not “function ‘effectively’ ” as Miranda required (Missouri v Seibert, 542 US at 611-612).
The New York Court of Appeals has similarly recognized that, under the New York Constitution, “the mere fact that [Miranda] warnings were uttered” is not, under all circumstances, sufficient to “justify the admission of subsequent statements” (People v Paulman, 5 NY3d at 130; see People v Chapple, 38 NY2d at 115 [.Miranda warnings given in the midst of a continuous interrogation were “insufficient to protect (the defendant’s) rights”]). Thus, the Court has suppressed statements given to law enforcement authorities where “there [was] inadequate assurance that the Miranda warnings were effective in protecting a defendant’s rights” (People v Paulman, 5 NY3d at 130; see People v Bethea, 67 NY2d at 367; People v Chapple, 38 NY2d at 115).
While these New York cases, as well as Missouri v Seibert, involved factual circumstances not presented here — i.e. prewarning discussions with, or statements to, police officers — they recognize the general principle that Miranda requires effective means to apprise suspects of their constitutional rights and the consequences of waiving those rights (see Miranda v Arizona, 384 US at 444), and that the failure to employ such effective means requires suppression of the challenged statements. Contrary to the People’s contention, this general principle, clearly set forth in the Miranda decision (see id.), is not limited to the factual circumstances presented in the continuous interrogation cases.
Accordingly, although Miranda warnings are read to suspects pursuant to the Program, the “mere recitation of the litany” does not suffice because, given the reading of the preamble, the warnings could not “function ‘effectively’ as Miranda requires” (Missouri v Seibert, 542 US at 611-612; see generally People v Bethea, 67 NY2d at 367; People v Chappie, 38 NY2d at 115; United States v Duvall, 537 F2d at 24 [prearraignment interrogations “are peculiarly likely to run afoul of Miranda”]).
Belatedly, a waiver of the privilege against self-incrimination and the right to counsel obtained pursuant to the Program’s protocol cannot be knowing and intelligent. Simply put, suspects cannot knowingly and intelligently waive their rights if they are *210 not effectively advised as to what those rights are, and the consequences of foregoing them (see Miranda v Arizona, 384 US at 468-471; see also Berghuis v Thompkins, 560 US at —, 130 S Ct at 2264; see generally Moran v Burbine, 475 US at 424). Indeed, effective advice as to the nature and consequences of a suspect’s constitutional rights is the very essence of the solution devised by Miranda to combat the compulsion inherent in custodial interrogation (see Moran v Burbine, 475 US at 427).
Ordinarily, the question of whether a defendant knowingly and intelligently waived his or her rights to remain silent and to an attorney is determined “upon an inquiry into the totality of the circumstances surrounding the interrogation,” including an evaluation of the defendant’s “age, experience, education, background, and intelligence” (Fare v Michael C., 442 US 707, 725 [1979]; see People v Williams, 62 NY2d at 288). Here, however, we are not faced with the question of whether the defendant was a person capable of understanding his rights and making a knowing and intelligent waiver (cf. People v Williams, 62 NY2d at 287 [holding that “(a)n effective waiver oí Miranda rights may be made by an accused of subnormal intelligence so long as it is established that he or she understood the immediate meaning of the warnings”]). There is no indication in this case that, had the Miranda warnings simply been read to the defendant, without the information and suggestion contained in the preamble, he could not have understood them. Rather, the problem is that the defendant never received a clear and unequivocal advisement of his rights, and thus, the only element his age, experience, education, background, and intelligence could have contributed was independent knowledge of his rights. The Miranda decision made clear, however, that a suspect is never presumed to know his or her rights (see Miranda v Arizona, 384 US at 468 [“The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given”]; People v Bracero, 117 AD2d at 740). Having never received an effective warning describing their constitutional rights, under the dictates of Miranda, suspects, such as the defendant, who are subject to the Program cannot be said to have knowingly waived those rights (see People v Bracero, 117 AD2d at 740-741 [“While we acknowledge that there need not be a ‘talismanic incantation’ of preinterrogation *211 admonitions in order to pass constitutional muster, the substance of the requisite warnings must nevertheless be clearly-conveyed for a waiver to be deemed effective” (citation omitted)]).
We agree with the People’s contention that Miranda warnings need not be “the first words uttered” by law enforcement authorities conducting an interrogation in order to permit admission of a suspect’s statements. As the People correctly observe, courts have permitted admission of such statements where certain remarks were made by police prior to reading the Miranda warnings (see e.g. People v Malaussena, 10 NY3d 904, 905 [2008]; People v Vasquez, 90 NY2d 972 [1997]; People v Bailey, 24 AD3d 684 [2005]; see also People v Rufino, 293 AD2d 498, 498-499 [2002]). For example, this Court has held that inculpatory statements were properly admitted even though, prior to the administration of Miranda warnings, an investigating detective told the defendant that he was being brought to an interview room because she wanted him to “tell [her] in his own words what took place” and that she wanted him to “tell [her] what happened” (People v Bailey, 24 AD3d at 685).
These cases involving limited, offhand remarks by police officers do not compare to the systematic practice developed by the District Attorney’s office. The formality of the interviews conducted pursuant to the Program, and, more significantly, of the preamble, as well as the fact that suspects are meeting with a prosecutor just prior to being officially charged at arraignment, lend greater weight and authority to the statements read in the preamble and, thus, stand to impress themselves upon the minds of suspects in a manner not likely to occur with a brief, offhand remark by a police officer during the course of an investigation. For these reasons, it is far more likely that the recitation of the preamble will serve to confuse, or at worst, mislead, suspects as to the nature of their rights and the consequences of waiving them, whereas offhand remarks usually will not rise to the level of obfuscating the meaning of the Miranda warnings. The interview conducted in this case evinces such confusion, in that the defendant twice interrupted the questioning to ask how the interview was “helping” him, and asked whether he would next be speaking to the “D.A.” In contrast, where a suspect has merely heard that a police officer investigating a crime wants him to tell the officer what happened, the Miranda warnings are still capable of reasonably conveying the suspect’s rights and the consequences of waiving those rights. *212 Indeed, in Missouri v Seibert, the plurality contrasted the official “question-first” protocol — “a police strategy adapted to undermine the Miranda warnings” — with a police officer’s brief remarks to a suspect, which constituted a “good-faith Miranda mistake, not only open to correction by careful warnings . . . but posing no threat to warn-first practice generally” (542 US at 615-616; see hat the statement at issue was not elicited “through a process of systematic . . . questioning”]).[2]
Similarly, the People’s reliance upon cases in which inculpatory statements were admitted despite promises or false statements having been made by police to secure those confessions is unavailing (see e.g. Matter of Jimmy D., 15 NY3d 417 [2010]; People v McQueen, 18 NY2d 337, 345-346 [1966]; People v Lugo, 60 AD3d 867, 868 [2009]; People v D’Amico, 296 AD2d 579, 580 [2002]; People v Williamson, 245 AD2d 966 [1997]; People v Jordan, 193 AD2d 890 [1993]; People v Hassell, 180 AD2d 819, 820 [1992]; People v Taber, 115 AD2d 126, 127 [1985]). The question in those cases was whether the inculpatory statements were inadmissible, either because the promises or false statements rendered them involuntary under CPL 60.45 (2) (b) (i) or because the deception was “so fundamentally unfair as to deny [the defendants] due process” (People v Tarsia, 50 NY2d 1, 11 [1980]; see Matter of Jimmy D., 15 NY3d at 424 [“since (the appellant’s) Miranda rights were validly waived and never reinvoked, the issue is voluntariness, not waiver”]; People v McQueen, 18 NY2d at 346; People v Lugo, 60 AD3d at 868; People v D’Amico, 296 AD2d at 580; People v Williamson, 245 AD2d at 968; People v Jordan, 193 AD2d 890 [1993]; People v Hassell, 180 AD2d at 820; People v Taber, 115 AD2d at 127; see also CPL *213 60.45 [2] [b] [i]). The question upon which we pass in the instant matter is not one of the voluntariness of the defendant’s inculpatory statement as a matter of due process. Rather, Miranda established a bright-line rule separate and apart from the question of voluntariness (see Dickerson v United States, 530 US at 444; Oregon v Elstad, 470 US 298, 306 [1985]). The failure to adequately advise a suspect of his or her rights as required by Miranda requires suppression of even voluntary statements (see Dickerson v United States, 530 US at 444; Miranda v Arizona, 384 US at 457).
In Missouri v Seibert, the Supreme Court pointed out that the “reason th[e] question-first [tactic was] catching on [was] as obvious as its manifest purpose, which [was] to get a confession the suspect would not make if he understood his rights at the outset” (542 US at 613). Here, the District Attorney’s Program raises a similar question, namely: Why is the preamble read before giving the Miranda warnings and obtaining a waiver of rights, instead of after the warnings are read and a waiver obtained? If the answer is that suspects are more likely to waive their rights after having heard the preamble, that lends support to the conclusion that, like in Missouri v Seibert, the warnings have been rendered ineffective by the preamble. Moreover, as this Court has recognized, “[t]his phase of the constitutional process” — i.e., the stage prior to the appointment of counsel for the accused — “requires an atmosphere geared to the protection of constitutional rights rather than a concern with overcoming such rights” (People v Campbell, 81 AD2d 300, 306 [1981]).
While the People insist that the preamble was “designed for the primary purpose of getting exculpatory information from the innocent', not inculpatory statements or evidence,” the conduct of the interview, in the present case at least, raises doubt about that assertion. Here, when Sergeant Picone and ADA Grillo explained that the defendant might tell them “it wasn’t me, I wasn’t there,” and the defendant responded that he could not truthfully make such an assertion, Sergeant Picone, without hesitation, stated: “No, you can’t say that because we have pictures of you and they found the BB gun and all that stuff.” This latter statement does not suggest a purpose of obtaining exculpatory evidence. Moreover, the People’s claim that the primary purpose of the interview is to obtain exculpatory information is inconsistent with their insistence that the preamble does not convey to suspects that the interview will redound to their benefit. In any event, this precise justification was offered in *214 Miranda in favor of unfettered police interrogation (see Miranda v Arizona, 384 US at 482 [it was argued that unfettered interrogation “will often redound to the benefit of the person questioned,” by permitting release of innocent suspects “without (the) need for further formal procedures”]). The Court in Miranda rejected that reasoning, concluding that “[t]he person who has committed no offense . . . will be better able to clear himself after warnings” (id.; see United States v Foley, 735 F2d 45, 48 [2d Cir 1984] [“Most, if not all,” of the “claimed advantages” of prearraignment interviews “would appear to be equally available immediately after arraignment, when a defendant would have the benefit of advice from his attorney and would be less vulnerable to psychological manipulation by the prosecutor”], cert denied sub nom. Edler v United States, 469 US 1161 [1985]).
In sum, Miranda set out to establish “concrete constitutional guidelines for law enforcement agencies and courts to follow” in the context of custodial interrogations (Miranda v Arizona, 384 US at 442). “[O]ne of the principal advantages,” therefore, has been “the ease and clarity of its application” and the “specificity” it provides in terms of informing police, prosecutors and courts what is permissible during a custodial interrogation (Moran v Burbine, 475 US at 425-426 [internal quotation marks omitted]). The reading of the preamble at issue in this case undermines the clarity achieved in Miranda. As a result, it cannot be said with reasonable certainty that suspects subjected to the Program understand their rights and the consequences of forgoing them. While the Program devised by the District Attorney’s office may not be as extreme as certain coercive methods of interrogation that punctuate Fifth Amendment jurisprudence, the Supreme Court has long recognized that “ ‘[illegitimate and unconstitutional practices get their first footing . . . by . . . slight deviations from legal modes of procedure’ ” (Miranda v Arizona, 384 US at 459, quoting Boyd v United States, 116 US 616, 635 [1886]). That deviation in the present case warrants suppression of the defendant’s inculpatory statements so as to give full effect to the constitutional principles underlying our accusatorial system of justice.
Furthermore, we cannot deem the error in admitting the defendant’s statement to be harmless. Such a constitutional error can be harmless only if the evidence of guilt, without reference to the error, is overwhelming, and there is no reasonable possibility that the error might have contributed to the defend *215 ant’s conviction, such that it is harmless beyond a reasonable doubt (see People v Crimmins, 36 NY2d 230, 237 [1975]; People v Schaeffer, 56 NY2d 448, 454 [1982]; People v Harris, 93 AD3d 58, 71 [2012], affd 20 NY3d 912 [2012]). As the Court of Appeals has recognized, this is “perhaps the most demanding test yet formulated,” and it is the “latter consideration” — i.e, the “causal effect” that the error may have had on the verdict, quite apart from the nature and quantum of proof — that is “critical in the application” of that test (People v Crimmins, 36 NY2d at 240-241).
Here, there is a gap in the People’s proof as to how the officers learned that the perpetrator fled in a livery cab with New Jersey license plates, since the complainant testified that she did not see the perpetrator flee. There were also inconsistencies in the testimony of the police officers regarding where in the livery cab the seized physical evidence was found. Further, although, as discussed below, we do not find the showup identification to have been so unduly suggestive as to preclude admission of the identification, the reliability, and thus weight, of the identification was lessened by the fact that Officer Diliberto was holding the striped shirt at waist height when the defendant was viewed by the complainant.
Bearing in mind these weaknesses in the People’s proof, we turn to the “critical” prejudice component of the constitutional harmless-error test. As the Court of Appeals has recognized with respect to this component, “confessions of crime, supremely self-condemnatory acts, are almost sure to weigh most heavily with fact finders” (People v Schaeffer, 56 NY2d at 455). Therefore, in the Schaeffer case, even though two bare admissions by the defendant that he shot the victim were properly admitted into evidence, the Court nonetheless held that an error in admitting the defendant’s fuller confession to the murder was not harmless because the erroneously admitted confession added details and supplied motive not provided by the bare admissions. Similarly, here, we cannot conclude that there was no reasonable possibility that the admission of the defendant’s confession affected the verdict. Rather, it served to corroborate the testimony of the other witnesses, most particularly the problematic identification testimony of the complainant, and provided the “ ‘most probative and damaging evidence’ ” against the defendant (People v Harris, 93 AD3d at 72, quoting Bruton v United States, 391 US 123, 139 [1968, White, J., dissenting]). Under these circumstances, even if the evidence of *216 the defendant’s guilt was overwhelming, there exists a reasonable possibility that the error contributed to the defendant’s conviction, such that the error was not harmless beyond a reasonable doubt (see People v Harris, 93 AD3d at 72).
In light of our determination that suppression of the videotaped statement was required because the defendant was not adequately and effectively apprised of his constitutional rights and the consequences of waiving them, we need not reach the contentions of the parties and amici curiae regarding the voluntariness of the defendant’s confession, including the argument that the confession was rendered involuntary, due to “improper conduct” (CPL 60.45 [2] [a]) consisting of violations of attorney-ethics rules, or in light of the totality of the circumstances surrounding the confession, including any undue delay in arraignment. We note, as to the claim of arraignment delay, that any such undue delay would merely be one factor in determining whether the defendant’s inculpatory statement was voluntary, and does not trigger the defendant’s indelible right to counsel (see People v Ramos, 99 NY2d 27, 37 [2002]; People v Hopkins, 58 NY2d 1079, 1081 [1983]; People v Holland, 48 NY2d 861 [1979]; People v Dairsaw, 46 NY2d 739 [1978], cert denied 440 US 985 [1979]; People v DeCampoamor, 91 AD3d 669, 670-671 [2012]).
We now address the other issues raised by the defendant on appeal, unrelated to his videotaped statement. First, we reject the defendant’s contention that the physical evidence — the striped shirt, hat, and air pistol — should have been suppressed because Officer Diliberto’s testimony that he discovered these items in plain view was “incredible as a matter of law” and “patently tailored to nullify constitutional objections.” While the defendant correctly observes that there were inconsistencies in the testimony of the police officers as to where the physical evidence was found in the livery cab, these inconsistencies did not rise to the level of rendering Officer Diliberto’s testimony that he saw the physical evidence in plain view in the back of the cab incredible as a matter of law or demonstrate that it was a fabrication patently tailored to meet constitutional objections (see People v Spann, 82 AD3d 1013, 1014 [2011]; People v Glenn, 53 AD3d 622, 624 [2008]; see also People v Barley, 82 AD3d 996, 997 [2011]; People v James, 19 AD3d 617, 618 [2005]; cf. People v Lebron, 184 AD2d 784, 785 [1992]; People v Rutledge, 21 AD3d 1125 [2005]). Moreover, upon the exercise of our factual review power (see Matter of Robert D., 69 AD3d 714, 716-717 [2010]), *217 we conclude that the inconsistencies in the testimony presented a credibility question for the hearing court, which determination is entitled to great deference on appeal (see People v Prochilo, 41 NY2d 759, 761 [1977]; People v Bennett, 57 AD3d 912 [2008]), and we discern no basis on this record to disturb that determination.
Contrary to the defendant’s further contention, the identification made by the complainant pursuant to the showup procedure was properly admitted. Showups conducted in close temporal and spatial proximity to the commission of the crime being investigated are generally permissible, where the procedure used is not unduly suggestive (see People v Brisco, 99 NY2d 596 [2003]; People v Johnson, 81 NY2d 828, 831 [1993]; People v Fox, 11 AD3d 709 [2004]). Here, the showup identification was conducted shortly after the incident, and in close proximity to the crime scene. Further, under the circumstances of this case, although the defendant was surrounded by police officers and the complainant viewed the blue and white striped shirt while she was viewing the defendant, the showup procedure was not thereby rendered unduly suggestive (see People v Brisco, 99 NY2d at 597; People v Parris, 70 AD3d 725, 726 [2010]; People v Barksdale, 66 AD3d 793 [2009]; People v Gonzalez, 57 AD3d 560, 561 [2008]; People v Berry, 50 AD3d 1047 [2008]; People v Fox, 11 AD3d 709 [2004]).
The defendant’s contention that his counsel was ineffective is based upon matter dehors the record, and, therefore, cannot be reviewed on direct appeal (see People v Smith, 98 AD3d 533 [2012], lv denied 20 NY3d 989 [2012]).
Nevertheless, because the defendant’s videotaped statement should have been suppressed, and the error in that regard was not harmless beyond a reasonable doubt, the judgment is reversed, on the law, that branch of the defendant’s omnibus motion which was to suppress a videotaped statement made by him to law enforcement authorities is granted, and a new trial is ordered.
Balkin, Leventhal and Cohen, JJ., concur.
Ordered that the judgment is reversed, on the law, that branch of the defendant’s omnibus motion which was to suppress a videotaped statement made by him to law enforcement authorities is granted, and a new trial is ordered.

. Although, as the People sirgue, the statement in the preamble that the interview is the suspect’s only opportunity to tell his or her story “before [going] to court on [the] charges” (emphasis added) may be technically accurate, it is not reasonable to expect an individual with no legal training to appreciate the subtle distinction that there may be other opportunities to tell his or her story after arraignment.

. While some of the aforementioned cases involving pre-warning remarks analyze whether such remarks constituted the functional equivalent of interrogation (see e.g. People v Bailey, 24 AD3d at 684), we do not find that analysis to be applicable to the present case. Whether or not the preamble was the functional equivalent of interrogation — i.e., designed to evoke an incriminating response (see id.; see also People v Ferro, 63 NY2d 316, 322-323 [1984], cert denied 472 US 1007 [1985]) — is not essential to our analysis. Our reasoning is more fundamental. The law requires that suspects be adequately and effectively advised of their constitutional rights, and the consequences of waiving them, prior to interrogation. The reading of the Miranda warnings, in light of the preamble, failed to effectively convey those rights and consequences. There is no question, of course, that after the reading of the preamble and the Miranda warnings, the defendant was, in fact, subjected to interrogation.