THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BRYAN KELLY, Appellant. [15 NYS3d 391]—

Appeal by the defendant from a judgment of the Supreme Court, Queens County (Camacho, J.), rendered August 30, 2010, convicting him of criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree, and unlawful possession of marijuana, after a nonjury trial, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress physical evidence.

Ordered that the judgment is affirmed.

The defendant contends that the hearing court should have granted that branch of his omnibus motion which was to suppress physical evidence because the testimony of the arresting officer was incredible and patently tailored to meet constitutional objections. This contention is unpreserved for appellate review, as the defendant failed to raise this specific contention before the hearing court (see CPL 470.05 [2]; People v Vann, 92 AD3d 702 [2012]; People v Inge, 90 AD3d 675, 676 [2011]; People v Muriello, 71 AD3d 1050, 1051 [2010]; People v Rivera, 27 AD3d 489, 490 [2006]). In any event, the defendant's contention is without merit.

At the suppression hearing, the arresting officer testified that, on August 2, 2008, at approximately 1:45 a.m., she was in an unmarked vehicle observing two groups of "kids." Specifically, the officer's attention was focused upon a group of four individuals, one of whom was the defendant. These individuals were standing "[t]owards the back" of a parked van. The officer indicated that she was drawn to these four individuals because she "thought they were trying to break into the vehicle." On the opposite side of the street stood a larger group of 30 to 40 people who were "throwing bottles, yelling, [and] screaming."

According to the officer, she then heard one gunshot coming from the direction of the four individuals, who were "huddled around each other." The officer further testified that she "saw sparks" that sounded "like a firecracker going off" and observed smoke coming from where the four individuals were standing. She testified that, based upon her training and experience as a police officer, she was able to determine that the shot was fired from the direction of the four individuals. A couple of seconds

after the first gunshot, the officer heard approximately five or six more gunshots. However, she could not determine where those shots originated.

Additional testimony was elicited from the officer that, after the first gunshot, the four individuals jumped into the van and sped away. The officer and her partner followed the van to a "housing development." At this point, the officers exited their vehicle, with weapons drawn, directing the four individuals not to move and to raise their hands. As the officers approached the van, a codefendant stated, "[t]hose shots over there have nothing to do with us."

At this point, the defendant and his three codefendants were removed from the van. A gun was then observed wedged in the middle console of the van. Thereafter, the defendant and his three codefendants were placed under arrest. At the precinct station house, the officer recovered marijuana from the defendant's person.

At the conclusion of the hearing, the Supreme Court fully credited the officer's testimony and denied that branch of the defendant's omnibus motion which was to suppress the physical evidence.

"The credibility determinations of a hearing court following a suppression hearing are accorded great deference on appeal, and will not be disturbed unless clearly unsupported by the record" (*People v Hobson*, 111 AD3d 958, 959 [2013]; *see People v Prochilo*, 41 NY2d 759, 761 [1977]; *People v Vargas*, 123 AD3d 1149 [2014]; *People v Mitchell*, 123 AD3d 945, 945-946 [2014]; *People v Jarvis*, 117 AD3d 969 [2014]). Here, the officer's testimony established that the search of the vehicle by the police was a proper warrantless search pursuant to the automobile exception, because they had probable cause to believe that it contained contraband, evidence of a crime, a weapon, or some means of escape (*see People v Martin*, 28 AD3d 583, 584 [2006]; *see also People v Blasich*, 73 NY2d 673, 678 [1989]; *People v Tieman*, 112 AD3d 975, 976 [2013]). Further, we find no support in the record for the defendant's contention that the officer's testimony was incredible as a matter of law, patently tailored to overcome constitutional objections, or otherwise unworthy of belief (*see People v Mitchell*, 123 AD3d at 946; *People v Jarvis*, 117 AD3d at 970; *People v Hobson*, 111 AD3d at 959; *People v Dunbar*, 104 AD3d 198, 216 [2013], *affd* 24 NY3d 304 [2014]).

The transcript of the suppression hearing, which consisted of almost 200 pages of testimony, reveals that the officer was closely and extensively examined and cross-examined by all

counsel and the court. Contrary to the position of our dissenting colleague, there is no basis to disturb the Supreme Court's determination that the officer's testimony was credible (*see People v Blake*, 123 AD3d 838 [2014]). Notwithstanding the dissent's assertions, the record establishes that the officer had a justifiable basis to think the four "huddled" individuals were trying to steal the van. The testimony was not incredible as a matter of law, as it was not manifestly untrue, physically impossible, contrary to experience, or self-contradictory (*see id.*; *People v Lynch*, 63 AD3d 959, 961 [2009]). Any inconsistencies in the officer's testimony did not render her testimony incredible or unreliable (*see People v Blake*, 123 AD3d at 839).

Contrary to the defendant's contention, his right of confrontation (*see* US Const Sixth Amend) was not violated when the People were permitted to introduce evidence of DNA testing performed on swabs taken from the recovered firearm and the defendant through the People's expert witness, who lacked firsthand knowledge of the testing. The DNA testing results, contained in a report by the Office of the Chief Medical Examiner, which was admitted into evidence, consisted of raw data and, thus, was not "testimonial" in nature (*Crawford v Washington*, 541 US 36, 36 [2004]; *see People v Brown*, 13 NY3d 332, 340 [2009]; *People v Fucito*, 108 AD3d 777 [2013]; *People v Pitre*, 108 AD3d 643, 644 [2013]). This raw data, standing alone, did not link the defendant to the crime (*see People v Sanders*, 118 AD3d 1029 [2014]; *People v Pitre*, 108 AD3d at 644; *People v Washington*, 108 AD3d 576, 577 [2013]; *People v Dail*, 69 AD3d 873, 875 [2010]). The testimony of the People's expert witness established that she conducted the critical analysis at issue by comparing the DNA recovered from the firearm to the defendant's DNA profile (*see People v Sanders*, 118 AD3d at 1030; *People v Washington*, 108 AD3d at 577; *People v Dail*, 69 AD3d at 875). Thus, the defendant's right of confrontation was not violated by the admission of the report or the testimony of the People's expert. Rivera, J.P., Austin and Roman, JJ., concur.

Hall, J., dissents, and votes to reverse the judgment, grant that branch of the defendant's omnibus motion which was to suppress physical evidence, and order a new trial, with the following memorandum: In my view, the Supreme Court should have granted that branch of the defendant's omnibus motion which was to suppress physical evidence because the testimony of the People's sole witness at the suppression hearing was incredible. Consequently, I respectfully dissent.

At the suppression hearing, the People's sole witness, a po-

lice officer assigned to the 100th Precinct, testified that on August 2, 2008, at approximately 1:45 a.m., she was in her unmarked car at the location of Beach 65th Street and Thursby Avenue in Queens. The officer, who was with her partner, was observing two groups of people. One group consisted of four individuals, one of whom was the defendant. On the other side of the street was another group, consisting of approximately 30 to 40 people.

According to the police officer, the group of four individuals were standing "right next to" a van. She testified that the four individuals were huddled around each other. Two of the individuals had their backs towards the officer, and were blocking her view of the individuals' hands. The other two individuals were facing the officer, while in the huddle. The police officer testified that she was drawn to the four individuals because she thought they were trying to break into the van. The other group was throwing glass bottles, screaming, and yelling. At one point, the police officer observed people in the larger group throwing glass bottles towards the opposite side of the street where the four individuals were standing. The bottles were breaking on the street and the sidewalk, where people were present. However, despite these observations, the police officer paid more attention to the four individuals than the larger group. The officer did not make any radio communication indicating that a group of individuals were throwing glass bottles that were breaking near others.

The officer initially testified that when she observed the four individuals, she was "a couple of feet" away from them. However, it was later clarified that she was approximately 20 feet away from the four individuals when she observed them.

As the police officer was watching the four individuals, she heard one gunshot, which, the officer stated, came from where the four individuals were standing. The officer also saw sparks coming from where the four individuals were standing, which were about neck high, in relation to the four individuals. The officer testified that the sparks came "from right within the group of the four [individuals]." The police officer described the spark as "like fire, like a firecracker going off. Like a light." The police officer also saw smoke at the time she heard the shot, which was coming from where the four individuals were standing. However, the police officer could not see the source of the smoke. In addition, the police officer could not see the hands of the four individuals. The officer did not see any of the four individuals raise their arms, produce a weapon, or point a weapon in any direction. The officer did not actually see any of

the four individuals with a gun in hand. The officer testified that, when she heard the gun shot, the four individuals were huddled in a circle.

Approximately one second after hearing the initial gunshot, the police officer heard five to six more gunshots. The police officer did not observe any smoke in connection with the additional gunshots. She did not know where the additional gunshots were coming from. The officer testified that she could not determine if the gunshots were coming from the area where the four individuals were standing. However, she later testified that when she heard the five to six additional shots, she did not see any sparks or smoke in the vicinity of the four individuals.

The police officer explained that, after the first gunshot, the four individuals proceeded to jump into the van that they were next to, and they sped off. The police officer followed the van. The police officer and her lieutenant, who was traveling in a separate car, eventually cut off the van, and the police officer and her lieutenant approached the van with their guns drawn. The police officer opened the driver's door and stated, "don't move." The four individuals were removed from the van. The police officer "went inside the van on the driver's side" while the lieutenant went to the passenger's side and flashed a flashlight into the van. While sitting in the driver's seat, the officer observed a gun, wedged into the bottom of the console on the floor, with its handle sticking out. The gun was removed and the four individuals were arrested.

The police officer testified that she filled out a complaint report in connection with the arrests. In the report, the officer made a note as to whether the weapon found in the van had been discharged. On cross-examination, the police officer was asked if she indicated, in the paperwork relating to the arrests, that the recovered gun had not been fired. The prosecutor's objection to this question was sustained. The Supreme Court did not allow any questioning into whether the officer indicated in her report that the gun had not been discharged.

The police officer testified that, at some point after the first shot, but perhaps not after all the shots, a woman, who was originally in the group of 30 to 40 people, ran into the street and yelled towards the four individuals, "Get out of here. The cops are coming." According to the police officer, at the point when the woman ran into the street, the four individuals were not yet in the van; rather, they were "running towards the van."

The Supreme Court, giving full credence to the police offi-

cer's testimony, denied the defendant's suppression motion. It is my opinion that this determination was in error.

While the credibility determinations of the Supreme Court following a suppression hearing are entitled to great deference on appeal (*see People v Prochilo*, 41 NY2d 759, 761 [1977]), a reviewing court is not required to "discard common sense and common knowledge" in assessing an officer's hearing testimony (*People v Garafolo*, 44 AD2d 86, 88 [1974]; *see People v Lebron*, 184 AD2d 784, 785 [1992]). "Where a testifying officer claims to have seen that which common sense dictates could not have been seen, courts have repeatedly deemed this testimony patently tailored to meet constitutional objections" (*People v Lebron*, 184 AD2d at 787).

In my view, common sense dictates that the events could not have unfolded as the police officer testified. First, it is curious that the police officer focused her attention on four individuals huddled next to the van, when a group of 30 to 40 individuals across the street were screaming, yelling, and throwing glass bottles into the street that were breaking near others. The police officer did not report this dangerous activity, and took no steps to calm down the larger group. Instead, the police officer apparently was focused on the four individuals because she thought they were trying to steal the van, but she provided no justifiable basis for that conclusion. The officer testified that the four individuals were "messing" with the van, and that they had their hands "around the latch, the lock" in the back of the van. This testimony contradicts the officer's earlier testimony that she could not view the individuals' hands. Moreover, after the shots were fired, the four individuals simply entered the van; they did not break into the van or open any latch in the back of the van. Under these circumstances, it is my opinion that the officer's testimony that the four individuals were "messing" with a latch in the back of the van is not credible.

The police officer's testimony with regard to the initial gunshot is also problematic. While the officer testified that she heard a gunshot and saw a flash or spark from within the group of four individuals, she did not see any individual with their arms raised, did not see any individual holding a gun, did not see anyone point a weapon in any direction, and did not observe a flash of a muzzle in front of any particular individual. Furthermore, in an affidavit signed in connection with the criminal court complaint, the officer stated that she heard gun shots and saw the four individuals "scurry[ ] away." She did not indicate in that prior statement that the flash came from

the vicinity of the four individuals. The Supreme Court ultimately sustained an objection to questioning in this regard, ostensibly on the ground that it was not clear whether the officer was asked if the flash came from the vicinity of the four individuals when making her prior statement.

Furthermore, it is unlikely that one of the four individuals shot a gun while in a circular huddle formation. Indeed, if a gun would have been shot in such a fashion, the shooter would have gravely risked injuring the three other individuals. The police officer, who could apparently see that the four individuals were huddled in a group, did not testify that any of the individuals turned to face away from the huddle or circle. It is contrary to human experience that a member of the four individuals would have fired a gun while standing in a circular huddle with three other people, in the same manner testified to by the police officer.

It is also curious that, after approximately five to six gunshots were fired, the police officer left this dangerous scene, without reporting anything with respect to the larger group, and then followed the four individuals.

In addition, the officer testified that after the woman from the group of 30 to 40 people ran into the street and warned the four individuals, the four individuals were "running towards the van." However, the officer testified earlier that the four individuals were "right next to" the van. These two statements cannot both be accurate.

Further, the Supreme Court should have allowed into evidence testimony from the police officer that she indicated in a report that the gun recovered from the van had not been discharged. This evidence was relevant, as it tended to disprove the officer's testimony that the initial gun shot came from one of the four individuals (see People v Scarola, 71 NY2d 769, 777 [1988]). Such evidence was highly relevant to the police officer's credibility, and there is no discernible unfair prejudice in allowing questioning on this matter. To the extent this issue, or any other issue raised herein, may be unpreserved for appellate review, I would nonetheless reach it in the exercise of this Court's interest of justice jurisdiction (see CPL 470.15 [3] [c]; [6] [a]).

While the defendant has the ultimate burden of proving illegality on this suppression motion, the People have the burden of going forward to show the legality of the police conduct in the first instance (see People v Malinsky, 15 NY2d 86, 91 n 2 [1965]). Where the testimony of the People's witnesses is unworthy of belief, "the People have not met their burden of

coming forward with sufficient evidence and [the court should] grant the motion to suppress" (*People v Berrios*, 28 NY2d 361, 369 [1971]). Under all the circumstances, I find that the police officer's testimony was incredible and patently tailored to meet constitutional objections (*see People v Lebron*, 184 AD2d at 787). Consequently, I find that the People have failed to meet their burden of going forward, and that the gun should have been suppressed (*see Wong Sun v United States*, 371 US 471, 488 [1963]; *People v Marcial*, 109 AD3d 937, 939 [2013]). Accordingly, I respectfully dissent and vote to reverse the judgment, grant that branch of the defendant's omnibus motion which was to suppress physical evidence, and order a new trial.