[23 NE3d 946, 998 NYS2d 679]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JERMAINE DUNBAR, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v COLLIN F. LLOYD-DOUGLAS, Respondent.

Argued September 18, 2014; decided October 28, 2014

## POINTS OF COUNSEL

*Barket, Marion, Epstein & Kearon, LLP*, Garden City (*Donna Aldea* of counsel), and *Richard A. Brown, District Attorney*, Kew Gardens (*John M. Ryan, James C. Quinn* and *Robert J. Masters* of counsel), for appellant in the first and second above-entitled actions. The Appellate Division erred in applying an unprecedented per se rule to automatically require suppression of defendant's voluntary videotaped statement without any regard to whether the interviewers' pre-*Miranda* remarks impacted the knowing, intelligent and voluntary nature of this particular defendant's waiver in this particular case. (*People v Hutchinson*, 59 NY2d 923; *Missouri v Seibert*, 542 US 600; *People v Chapple*, 38 NY2d 112; *People v Paulman*, 5 NY3d 122; *Colorado v Spring*, 479 US 564; *Moran v Burbine*, 475 US 412; *People v Williams*, 62 NY2d 285; *Fare v Michael C.*, 442 US 707; *Arizona v Fulminante*, 499 US 279; *People v Perez*, 37 Misc 3d 272.)

*Lynn W.L. Fahey, Appellate Advocates*, New York City (*Allegra Glashausser* and *Leila Hill* of counsel), for respondents in the first and second above-entitled actions. I. The Appellate Division correctly held that respondent was never effectively informed of his *Miranda* rights, that the pre-*Miranda* script systematically undermined his privilege against self-incrimination and right to counsel, and that his statement therefore had to be suppressed. (*Dickerson v United States*, 530 US 428; *Moran v Burbine*, 475 US 412; *Fare v Michael C.*, 442 US 707; *Missouri v Seibert*, 542 US 600; *Colorado v Connelly*, 479 US 157; *Berghuis v Thompkins*, 560 US 370; *Brown v Walker*, 161 US 591; *Florida v Powell*, 559 US 50; *California v Prysock*, 453 US 355; *Rhode Island v Innis*, 446 US 291.) II. The People's argument that this Court should use the old totality-of-the-circumstances test is contrary to long-standing precedent, sidesteps the threshold inquiry of whether the *Miranda* warnings were effectively conveyed, and ignores the misleading language of the script. (*Dickerson v United States*, 530 US 428; *Missouri v Seibert*, 542 US 600; *People v Chapple*, 38 NY2d 112; *People v Keene*, 148 AD2d 977; *Fare v Michael C.*, 442 US 707; *People v Perez*, 37 Misc 3d 272; *Colorado v Spring*, 479 US 564; *Moran v Burbine*, 475 US 412; *People v Paulman*, 5 NY3d 122; *People v Anderson*, 42 NY2d 35.)

*Steven Banks, The Legal Aid Society*, New York City (*Steven B. Wasserman* of counsel), for The Legal Aid Society, amicus curiae in the first above-entitled action. I. The preamble to the

Queens District Attorney's central booking interrogation program systematically undermines the *Miranda* warnings, by conveying a misleading, equivocal, and coercive message about the consequences of making an uncounseled statement. (*Miranda v Arizona*, 384 US 436; *United States v Foley*, 735 F2d 45; *People v Pagan*, 19 NY3d 91.) II. The decision in *Dunbar* is consistent with U.S. Supreme Court authority disapproving law enforcement techniques that rob the *Miranda* warnings of full effectiveness. (*California v Prysock*, 453 US 355; *Duckworth v Eagan*, 492 US 195; *Missouri v Seibert*, 542 US 600.)

*New York Civil Liberties Union Foundation*, New York City (*Taylor Pendergrass, Christopher Dunn* and *Corey Stoughton* of counsel), and *American Civil Liberties Union Foundation*, New York City (*Ezekiel Edwards* and *Brandon Buskey* of counsel), for New York Civil Liberties Union and another, amici curiae in the first and second above-entitled actions. I. The District Attorney's program violates New York's indelible right to counsel. (*People v Grice*, 100 NY2d 318; *People v Settles*, 46 NY2d 154; *People v Cunningham*, 49 NY2d 203; *People v Hobson*, 39 NY2d 479; *People v Lopez*, 16 NY3d 375; *People v Krom*, 61 NY2d 187; *People v Bing*, 76 NY2d 331; *People v Kazmarick*, 52 NY2d 322; *People v Samuels*, 49 NY2d 218; *People v West*, 81 NY2d 370.) II. The District Attorney's program violates the right to a prompt court appearance. (*People v Ramos*, 99 NY2d 27; *Gerstein v Pugh*, 420 US 103; *People ex rel. Maxian v Brown*, 77 NY2d 422; *Upshaw v United States*, 335 US 410; *Corley v United States*, 556 US 303; *People v Lane*, 10 NY2d 347; *People v Everett*, 10 NY2d 500; *People v Donovan*, 13 NY2d 148.)

*Barbara S. Gillers, New York University School of Law*, New York City, and *Patterson Belknap Webb & Tyler LLP*, New York City (*Eugene M. Gelernter* and *Amy N. Vegari* of counsel), for Legal Ethics Bureau at New York University School of Law, amicus curiae in the first and second above-entitled actions. I. Prosecutors risk violating the Rules of Professional Conduct when interrogating indigent individuals immediately before arraignment and the appointment of counsel. (*Matter of Curry v Hosley*, 86 NY2d 470; *People v Hobson*, 39 NY2d 479; *Matter of Anonymous*, 32 AD2d 37; *Miranda v Arizona*, 384 US 436; *People v Skinner*, 52 NY2d 24; *People v Goldfinger*, 149 Misc 2d 765; *Matter of Curry v Hosley*, 86 NY2d 470; *Muriel Siebert & Co., Inc. v Intuit Inc.*, 8 NY3d 506; *Niesig v Team I*, 76 NY2d 363; *People v Moses*, 63 NY2d 299.) II. Suppression is the appropriate remedy where prejudicial evidence has been obtained

by the types of ethics violations described above. (*Matter of Brown v Blumenfeld*, 103 AD3d 45; *People v Perez*, 37 Misc 3d 272; *People v Skinner*, 52 NY2d 24; *People v Hobson*, 39 NY2d 479; *United States v Hammad*, 858 F2d 834; *United States v Leon*, 468 US 897; *People v Jones*, 2 NY3d 235.)

*Frank A. Sedita III*, Buffalo, *Morrie I. Kleinbart*, Staten Island, and *Donna Milling*, Buffalo, for District Attorneys Association of the State of New York, amicus curiae in the first and second above-entitled actions. As long as the *Miranda* warnings administered to someone being questioned includes the four critical rights identified by the Supreme Court, the propriety of any waiver of those constitutional rights is judged by an examination of the totality of the circumstances of the waiver. (*Dickerson v United States*, 530 US 428; *California v Prysock*, 453 US 355; *Florida v Powell*, 559 US 50; *Rhode Island v Innis*, 446 US 291; *Bram v United States*, 168 US 532; *People v Hawkins*, 55 NY2d 474; *Berghuis v Thompkins*, 560 US 370; *Johnson v Zerbst*, 304 US 458; *North Carolina v Butler*, 441 US 369; *Moran v Burbine*, 475 US 412.)

### OPINION OF THE COURT

READ, J.

Beginning in 2007, the Queens County District Attorney implemented a central booking prearraignment interview program, launched in conjunction with the initiative to videotape interrogations. The program consisted of a structured, videotaped interview conducted by two members of the District Attorney's staff (an assistant district attorney and a detective investigator [DI]) with a suspect immediately prior to arraignment. During this interview, the DI delivered a scripted preface or "preamble" to the *Miranda* warnings that, among other things, informed the suspect that "this is your opportunity to tell us your story," and "your only opportunity" to do so before going before a judge. After being so cautioned, defendants Jermaine Dunbar (Dunbar) and Collin F. Lloyd-Douglas (Lloyd-Douglas) made statements in their respective interviews, which they later sought to suppress. We hold that the preamble undermined the subsequently-communicated *Miranda* warnings to the extent that Dunbar and Lloyd-Douglas were not " 'adequately and effectively' advised of the choice [the Fifth Amendment] guarantees" against self-incrimination (*Missouri v Seibert*, 542 US 600, 611 [2004], quoting *Miranda v Arizona*, 384 US 436, 467 [1966]) before they agreed to speak with law enforcement authorities.

## I.

### *Dunbar*

On April 23, 2009, at 12:40 p.m., Dunbar entered a money wiring and office services store in Queens where a lone cashier was working at the time. He threatened the cashier with what appeared to be a gun and demanded that she turn over money. Locked in a plexiglass enclosure, the cashier threw herself to the floor, called 911 and pressed the distress button. Thus thwarted, Dunbar fled in a waiting black livery car with New Jersey license plates. He was apprehended less than five minutes later when police officers patrolling in the area spotted the car. The cashier identified Dunbar as the would-be robber in a showup soon after. She had told the police that the perpetrator was a thin black man who wore a blue and white striped shirt and a hat, and the police discovered these items and an imitation pistol on the floor of the getaway car. Dunbar was arrested at 12:59 p.m. and brought to central booking in Queens.

About 23 hours after he was taken into custody, at 12:03 p.m. on April 24, 2009, Dunbar was interviewed by a DI and an assistant district attorney. The Assistant District Attorney described for Dunbar the charges he would be facing when he went to court, including the date, time and place of the crimes alleged. The DI then informed Dunbar that "in a few minutes I am going to read you your rights. After that, you will be given an opportunity to explain what you did and what happened at that date, time and place." She then delivered the preamble, advising Dunbar as follows:

> "If you have an alibi, give me as much information as you can, including the names of any people you were with.

> "If your version of what happened is different from what we've been told, this is your opportunity to tell us your story.

> "If there is something you need us to investigate about this case you have to tell us now so we can look into it.

> "Even if you have already spoken to someone else you do not have to talk to us.

> "This will be your only opportunity to speak with us before you go to court on these charges."

The DI continued without a break, following a script, next informing Dunbar that "[t]his entire interview is being recorded with both video and sound"; and "I'm going to read you your rights now, and then you can decide if you want to speak with us, O.K.?" She then advised "You have the right to be arraigned without undue delay; that is, to be brought before a judge, to be advised of the charges against you, to have an attorney assigned to or appointed for you, and to have the question of bail decided by the court"; gave the *Miranda* warnings; and, finally, asked "Now that I have advised you of your rights, are you willing to answer questions?" Dunbar indicated his understanding of each warning as it was given, and his willingness to continue the interview.

When the DI asked Dunbar "what happened," he related that a man named Pete had told him about "robbing this place." Dunbar twice interrupted the questioning to express puzzlement as to how the interview was helping him. He remarked that he "want[ed] to work around this," and asked if he would be talking to "the D.A." next. Dunbar was told that the next person he would be speaking to was his lawyer. The Assistant District Attorney and DI explained that it was their job to determine if there was anything Dunbar needed them to investigate, and to find out his side of the story. Dunbar responded that his side of the story was that he was forced by Pete and "Ralphy" (the driver of the livery cab) to rob the store.

After Dunbar was indicted for second-degree attempted robbery (Penal Law §§ 160.10 [1]; 110.00), fourth-degree criminal mischief (Penal Law § 145.00 [1]) and other crimes, he made a motion to suppress. As relevant to this appeal, he argued that his videotaped statement was not voluntary and that he had not been adequately advised of his *Miranda* rights. After a hearing, the suppression court denied the motion, reasoning that, in view of the totality of the circumstances, Dunbar's statement was voluntarily made after a valid *Miranda* waiver and before his right to counsel attached under New York law.

At Dunbar's jury trial, the cashier identified him as the perpetrator and police testimony established that he had been arrested within minutes of the robbery. Additionally, the jurors were shown both surveillance video depicting Dunbar at the store and the videotaped interview. Dunbar was convicted of attempted robbery and criminal mischief, the two remaining counts of the indictment. On May 20, 2010, Supreme Court sentenced him as a persistent violent felony offender to an indeterminate prison term of from 17 years to life. Dunbar appealed.

On January 30, 2013, the Appellate Division unanimously reversed, concluding that the preamble "add[ed] information and suggestion . . . which prevent[ed] [the *Miranda* warnings] from effectively conveying to suspects their rights," creating a "muddled and ambiguous" message (104 AD3d 198, 207 [2d Dept 2013]). In this regard, the court rejected the argument, advanced by the People, that the effect of the preamble had to be assessed on a case-by-case basis, taking into account the individual experience and circumstances of each suspect. In the Appellate Division's view, such case-by-case determination, while relevant to the voluntariness of a waiver, was irrelevant to the question of whether *Miranda* warnings were properly administered in the first place (*id.* at 210). The court further determined that the error in admitting the videotaped statement was not harmless beyond a reasonable doubt in light of the facts and circumstances of the case, and so ordered a new trial. A Judge of this Court granted the People's application for leave to appeal (21 NY3d 942 [2013]), and we now affirm.

## *Lloyd-Douglas*

On the evening of September 6, 2005, Lloyd-Douglas got into an argument with P.D. with whom he was romantically involved. P.D. testified that the next morning, Lloyd-Douglas attacked her with a hammer as she left for work from the apartment she and Lloyd-Douglas shared. P.D. suffered grievous injuries, including a fractured skull. Ignoring P.D.'s pleas to call an ambulance, Lloyd-Douglas waited around in the apartment for three or four hours before leaving and, according to P.D., he took her phone, money and identification with him. She managed to crawl to her bedroom and call 911. After being transported to the hospital, P.D. underwent emergency surgery to remove bone fragments and damaged parts of her brain; P.D.'s injuries left her with difficulty talking, understanding, balancing, standing and walking, and required additional surgery and extensive physical therapy.

Lloyd-Douglas was apprehended about three years after this incident, on June 12, 2008. While at central booking in Queens, he was interviewed by an assistant district attorney and a DI. The DI introduced herself and the Assistant District Attorney, told Lloyd-Douglas the charges he would be facing and that he would be read his rights "in a few minutes," after which he would have "an opportunity to explain what you did and what happened at that date, time, and place." The DI then delivered

the preamble; told Lloyd-Douglas that the interview was being recorded with both video and sound; that she was going to "read him his rights" and then he could "talk with [her] if he like[d]"; advised him of his right to be arraigned without undue delay; gave the *Miranda* warnings and concluded by asking "Now that I have advised you of your rights, are you willing to answer questions?" Like Dunbar, Lloyd-Douglas indicated his understanding of each warning as it was given, and agreed to participate in an interview.*

Lloyd-Douglas acknowledged that he had fought with P.D. the day of the incident, but claimed that she had attacked him with the hammer and somehow injured herself during the ensuing struggle as he sought to protect himself. He acknowledged remaining in the apartment with her for several hours afterwards, as well as his refusal to call an ambulance; he denied taking P.D.'s wallet or cell phone. Lloyd-Douglas insisted that P.D. did not appear to him to be seriously hurt, and that he had made sure before he left that she had access to a telephone so that she might call an ambulance if she wished to do so.

After Lloyd-Douglas was indicted for attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]), first-degree assault (Penal Law § 120.10 [1]), first-degree robbery (Penal Law § 160.15), unlawful imprisonment in the first degree (Penal Law § 135.10), criminal possession of a weapon in the third degree (Penal Law § 265.02 [1]) and other crimes, he moved to suppress his videotaped statement. He argued that the statement was involuntary because he had been held in central booking for about 22 hours and had not been specifically asked by the DI if he wanted food or water, if he needed to use the bathroom or was on any medication. The People responded that the statement was voluntarily made after a valid *Miranda* waiver, that Lloyd-Douglas was arraigned in less than 24 hours, that he had access to the bathroom, food and water and that he was questioned for less than 30 minutes. The People further argued that the voluntariness of the waiver and statement was established by the video itself, which showed that Lloyd-Douglas took control of the interview.

---

* Lloyd-Douglas's interview occurred about 10 months before Dunbar's. The sequence of statements made by the DI in the two interviews is the same, and the wording of the statements themselves is identical or, to the extent there are differences, they are trivial ones. Of course, this is to be expected since the central booking prearraignment interview program was intended to put in place a standardized interview procedure.

After a hearing, the Judicial Hearing Officer issued a written decision, subsequently confirmed by Supreme Court on September 17, 2009, denying Lloyd-Douglas's motion to suppress. The Hearing Officer concluded that "the People have proved, beyond a reasonable doubt, that the defendant's statements were made pursuant to his knowing, intelligent, and voluntary waiver of his constitutional rights." She credited the DI's testimony and found "nothing in the record to indicate that the defendant was threatened to make a statement or that his will was overborne," and that "no evidence was adduced to indicate that the defendant was irrational or in any way incapable of appreciating the consequences of his statements, nor that he was subjected to 'overbearing interrogation.' "

At Lloyd-Douglas's jury trial in Supreme Court, P.D. identified him as her assailant and testified about the details of the assault, medical evidence established the nature and extent of her injuries and the jurors were shown Lloyd-Douglas's videotaped interview. Lloyd-Douglas testified on his own behalf and claimed, consistent with his videotaped statement, that he fought with P.D., but that she attacked him with the hammer and her injuries were self-inflicted; the trial judge gave a justification instruction. The jury convicted Lloyd-Douglas of all the crimes submitted to the jury except robbery, and on April 6, 2010, Supreme Court sentenced him to prison for 15 years, to be followed by five years of postrelease supervision. He appealed.

On January 30, 2013, the Appellate Division unanimously reversed (102 AD3d 986 [2d Dept 2013]), ordering suppression of the statement for the reasons stated in the companion case of *People v Dunbar* (104 AD3d 198 [2013], *supra*). The court further concluded that the error was not harmless beyond a reasonable doubt in light of the facts and circumstances of the case, and so ordered a new trial. A Judge of this Court granted the People's application for leave to appeal (21 NY3d 944 [2013]), and we now affirm.

## II.

An individual taken into custody by law enforcement authorities for questioning "must be adequately and effectively apprised of his rights" safeguarded by the Fifth Amendment privilege against self-incrimination (*Miranda*, 384 US at 467; US Const Amend V). First, the authorities must inform a suspect in "clear and unequivocal terms" of the right to remain silent (*id.* at 467-468). Second, they must make a suspect "aware not only

of the privilege, but also of the consequences of forgoing it" by explaining that "anything" he says during the interrogation "can and will be used against [him] in court" (*id.* at 469). "[T]o assure that [this] right to choose between silence and speech remains unfettered throughout the interrogation process," the authorities must also explain to the suspect that he has a right to the presence of an attorney (*id.*). And finally, so that the right to an attorney is not "hollow," the authorities must also advise the suspect "that if he is indigent a lawyer will be appointed to represent him" (*id.* at 473).

These four warnings are an "absolute prerequisite to interrogation" (*id.* at 471). Further,

> "[t]he Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, [a court does] not pause to inquire in individual cases whether the defendant was aware of his rights *without* a warning being given" (*id.* at 468 [emphasis added]).

In sum, absent a "full and effective warning of [these] rights" and a knowing, intelligent and voluntary waiver, statements made by a suspect during custodial interrogation must be suppressed (*id.* at 445, 475-476).

Although *Miranda*'s bright-line rule was controversial at first, it "has become embedded in routine police practice to the point where the warnings have become part of our national culture" (*Dickerson v United States*, 530 US 428, 443 [2000]). Prior to the *Miranda* decision, courts looked at every confession individually for voluntariness, using a totality-of-the-circumstances test grounded in notions of due process (*id.* at 432-433). This due process test took into consideration "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation" (*id.* at 434 [internal quotation marks omitted]).

While the prosecution still must prove voluntariness of a confession, "*Miranda* changed the focus of much of the inquiry" (*id.*). Indeed, "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver" (*Seibert*, 542 US at 608-609).

Since *Miranda* was handed down, the Supreme Court has declined to return to the totality-of-the-circumstances test of voluntariness, or to allow the government to meet its burden without demonstrating compliance with the *Miranda* procedure. In *Dickerson*, the Court rejected a congressional attempt to revive the former totality-of-the-circumstances test, holding that *Miranda* is "constitutionally based" and reaffirming that it governs the admissibility of statements in federal and state courts (*Dickerson*, 530 US at 432, 440). And in *Seibert*, the Court rebuffed a creative attempt to end run *Miranda*. *Seibert* addressed the question-first-and-warn-later police protocol that called for giving a suspect no warnings of the rights to silence and counsel until after interrogation had produced a confession. At that point, the interrogator would deliver the *Miranda* warnings and, assuming the suspect waived *Miranda* rights, repeat the questioning to elicit the information already provided in the prewarning statement. Writing for the plurality, Justice Souter explained that, under these circumstances, the warnings could not function "effectively" as *Miranda* requires (*Seibert*, 542 US at 611).

Here, the People acknowledge that a statement made in the absence of *Miranda* warnings must be suppressed without regard to the individual circumstances of the suspect. But they argue that where no interrogation precedes a suspect's *Miranda* waiver (unlike *Seibert*) and *Miranda* rights are fully administered, acknowledged and waived, law enforcement's statements or conduct prior to the waiver bear only on the question of whether the waiver was knowing, voluntary and intelligent under the totality of the circumstances—a factual inquiry to be made on a case-by-case basis.

But just as no "talismanic incantation [is] required to satisfy [*Miranda*'s] strictures" (*California v Prysock*, 453 US 355, 359 [1981]), "it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance" (*Seibert*, 542 US at 611). "The inquiry is . . . whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*' " (*Duckworth v Eagan*, 492 US 195, 203 [1989], quoting *Prysock*, 453 US at 361). Thus in *Seibert*, the issue was whether, in light of the protocol employed by the police in that case, "the warnings [could] effectively advise the suspect that he had a real choice about giving an admissible statement" (*Seibert*, 542 US at 612).

Here, there is no claim that the *Miranda* warnings themselves failed to apprise Dunbar and Lloyd-Douglas of their rights. The

issue, as in *Seibert*, is whether a standardized procedure—there, the question-first-and-warn-later protocol; here, the preamble—effectively vitiated or at least neutralized the effect of the subsequently-delivered *Miranda* warnings. We agree with the Appellate Division that the preamble, which is at best confusing and at worst misleading, rendered the subsequent *Miranda* warnings inadequate and ineffective in advising Dunbar and Lloyd-Douglas of their rights.

Before they were read their *Miranda* rights, Dunbar and Lloyd-Douglas were warned, for all intents and purposes, that remaining silent or invoking the right to counsel would come at a price—they would be giving up a valuable opportunity to speak with an assistant district attorney, to have their cases investigated or to assert alibi defenses. The statements to "give me as much information as you can," that "this is your opportunity to tell us your story" and that you "have to tell us now" directly contradicted the later warning that they had the right to remain silent. By advising them that speaking would facilitate an investigation, the interrogators implied that these defendants' words would be used to help them, thus undoing the heart of the warning that anything they said could and would be used against them. And the statement that the prearraignment interrogation was their "only opportunity" to speak falsely suggested that requesting counsel would cause them to lose the chance to talk to an assistant district attorney.

In sum, the issue in these cases is not whether, under the totality of the circumstances, these defendants' waivers were valid, but rather whether or not they were ever "clearly informed" of their *Miranda* rights in the first place, as is constitutionally required. We agree with the Appellate Division that they were not: the preamble undercut the meaning of all four *Miranda* warnings, depriving Dunbar and Lloyd-Douglas of an effective explanation of their rights. Certainly, if the *Miranda* warnings were preceded by statements that were *directly* contrary to those warnings (*e.g.*, you are required to answer our questions; your statements will be used to help you; you are not entitled to a lawyer) there would be no need to examine the totality of the circumstances to determine if a *Miranda* waiver was knowing, voluntary and intelligent. The preamble did the same thing, albeit in an indirect, more subtle way. While a lawyer would not be fooled, a reasonable person in these defendants' shoes might well have concluded, after having listened to the preamble, that it was in his best interest to get out his side of the story—fast.

Finally, the People did not ask us to review the Appellate Division's rulings that the improper admission of the videotaped interviews were not harmless beyond a reasonable doubt. We therefore do not reach and express no opinion about this issue. Accordingly, the orders of the Appellate Division should be affirmed.

SMITH, J. (dissenting). The purpose of *Miranda* is to be sure that suspects are informed of their rights and understand them. That purpose is not undermined when police or prosecutors persuade a properly-informed suspect to waive his or her rights. I think that is all that happened here, and I would hold that defendants' statements need not be suppressed.

The central holding of *Miranda* is that, before a suspect in custody is questioned, "[T]he following measures are required":

> "He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires" (*Miranda v Arizona*, 384 US 436, 479 [1966]).

The Supreme Court also said in *Miranda*: "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently" (*id.* at 444).

It is undisputed that both these defendants received proper *Miranda* warnings and agreed to answer questions. I do not argue that that ends the matter. Of course *Miranda* would be violated if the State had, as in *Missouri v Seibert* (542 US 600 [2004]), trapped defendants into telling their story before they heard their rights. And I agree with the majority that it would also be violated if the warnings were accompanied by statements that were directly or indirectly contrary to the warnings (majority op at 316). But no such statements were made here. There is nothing in the preamble that the Queens District Attorney's office affixed to the warnings that expressly or impliedly contradicts the warnings themselves. No reasonable person in the position of either of these defendants would conclude from the preamble that he did not have a right to remain silent; that anything he said could not be used against him; that he was not entitled to a lawyer; or that the State would not provide him a lawyer free of charge.

I admit that the wording of the preamble is not perfect. Its third sentence—"If there is something you need us to investigate about this case, you have to tell us now so that we can look into it"—is unhappily phrased; I wish the word "please" had replaced the words "you have to." But that change would not significantly alter the substance of the statement. No reasonable person would get the impression from this sentence that he literally *had to* speak on pain of punishment, or that the police would refuse to investigate anything that came to their attention later. In the unlikely event that any suspect even considered taking "you have to" literally, his confusion would be eliminated by the plain wording of the first *Miranda* warning: "You have the right to remain silent." Viewed as a whole, what was said to each of these defendants before questioning began "reasonably conve[yed] . . . his rights as required by *Miranda*" (*Florida v Powell*, 559 US 50, 60 [2010] [internal quotation marks and citations omitted]).

The majority's real complaint with the preamble is not that it is likely to confuse a suspect about what his rights are, but that it might persuade him to waive them. As the majority says, "a reasonable person in these defendants' shoes might well have concluded, after having listened to the preamble, that it was in his best interest to get out his side of the story—fast" (majority op at 316). Indeed he might, but why should that distress us? In fact, if the suspect happened to be innocent—if he had nothing whatever to do with the crime—that conclusion would probably be correct. It is usually in the interest of an innocent person to give investigators the true facts as soon as possible, before the evidentiary trail has grown cold and before an alibi can be tainted by the suspicion of contrivance (*cf.* William J. Stuntz, *Miranda's Mistake*, 99 Mich L Rev 975, 996-997 [2001] [arguing that an innocent suspect's best chance to avoid incarceration and conviction is to persuade the police of his innocence before the State decides to press charges]). There are innocent people, though I hope not many, who are arraigned for crimes, and the preamble to the *Miranda* warnings, assuming it had any effect at all, might help some of them to avoid a period of unjust imprisonment, or even an unjust conviction.

But I do not suggest that it is the primary purpose or effect of the preamble to protect the innocent. The Queens District Attorney's office surely assumes, perhaps correctly, that the great majority of people arrested and arraigned are guilty. The main purpose of the preamble is, no doubt, to persuade guilty people

to speak, in the hope that they will either admit their guilt or, in denying it, tell a story that can be proved false. The preamble seeks to exploit the natural impulse of any guilty defendant to think that he can talk his way out of trouble, by persuading police or prosecutors either that he is innocent or that he deserves leniency. But *Miranda* does not require law enforcement officials to repress, or forbid them to encourage, the tendency of criminals to talk too much. That tendency greatly contributes to the efficiency of law enforcement; many more crimes would go unpunished if it did not exist.

The records in these cases lead me to conclude that these two defendants, assuming they listened attentively to both the preamble to the *Miranda* warnings and the warnings themselves, knew their rights, and decided, freely and voluntarily, to waive them. As it turns out that was, as it often is, a foolish choice, but the privilege against self-incrimination protects suspects against government coercion, not against their own foolishness. I would reverse the Appellate Division orders.

Chief Judge LIPPMAN and Judges GRAFFEO, PIGOTT, RIVERA and ABDUS-SALAAM concur; Judge SMITH dissents in an opinion.

In each case: Order affirmed.