# State of New York
# Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 59  SSM 5
The People &c.,
        Respondent,
     v.
Malik Dawson,
        Appellant.

Submitted by James A. Bartosik, Jr., for appellant.
Submitted by Emily Schultz, for respondent

MEMORANDUM:

The order of the Appellate Division should be affirmed.

Once a defendant in custody unequivocally requests the assistance of counsel, the

right to counsel may not be waived outside the presence of counsel (*see People v Glover*,

- 1 -

87 NY2d 838, 839 [1995]).   But "[a] suggestion that counsel might be desired; a notification that counsel exists; or a query as to whether counsel ought to be obtained will not suffice" to unequivocally invoke the indelible right to counsel (*see People v Mitchell*, 2 NY3d 272, 276 [2004], citing *People v Roe*, 73 NY2d 1004 [1989]; *People v Fridman*, 71 NY2d 845 [1988]; *People v Hicks*, 69 NY2d 969 [1987]).   Furthermore, "[w]hether a particular request is or is not unequivocal is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant" (*Glover*, 87 NY2d at 839).

Here, there is support in the record[1] for the lower courts' determination that defendant—whose inquiries and demeanor suggested a conditional interest in speaking with an attorney only if it would not otherwise delay his clearly-expressed wish to speak to the police—did not unequivocally invoke his right to counsel while in custody.   That mixed question of law and fact is therefore beyond further review by this Court (*id.*; *see Mitchell*, 2 NY3d at 276).   Defendant's remaining contentions are without merit.

---

[1] As the dissent recognizes, there is no official transcript of the videotaped conversation between the police and defendant, but even the dissent's self-transcribed account reflects record support for the lower courts' findings.

WILSON, J. (dissenting):

A week after an alleged sexual offense occurred, the police arrested 19-year-old Malik Dawson. It is clear from videotaped record of the interrogation that Mr. Dawson unequivocally and repeatedly asked to contact his lawyer. Instead, he was never given the

chance to do so, and eventually consented to waive his *Miranda* rights. If the video were not part of a sealed record, you could see this for yourself. Instead, you will have to bear through what my transcription of the video shows. Because Mr. Dawson clearly requested counsel, any subsequent waiver of his *Miranda* rights, without counsel present, was invalid (*see People v Cunningham*, 49 NY2d 203, 207 [1980]). The majority's holding vitiates the privilege against self-incrimination, right to counsel and due process that our Court has scrupulously guarded through protections deliberately greater than those afforded under the federal Constitution. Regrettably, today's decision is merely the latest in a string in which we disregard the clear meaning of a defendant's words by applying a standard of verbal precision even jurists find hard to meet.

I.

About a week after an alleged sexual assault occurred, the police arrested Malik Dawson. He was brought to the police station in handcuffs where police took his phone, shackled his leg to a chair, and instructed him to sit and wait in a small room. He was not informed of why he had been brought to the police station or what the police wanted to talk about. After waiting alone for close to two hours, a detective entered the room. Mr. Dawson asked, "What's going on?" The detective responded, "I know you want to figure this out and why you're down here and I want to explain it to you, but before I could do that, you're in a police station, OK." The detective asked, "Have you ever heard of Miranda rights?" Mr. Dawson answered, "No." The detective then asked, "So you ever watch Cops, Law and Order, anything like that?" Mr. Dawson responded, "Yeah, I've seen a couple of them." The detective then said, "You know, when they interview people they have to inform them

of their rights. These are your Miranda rights." Mr. Dawson said, "Oh, the right to remain silent?"

The Detective then read a set of standard *Miranda* rights to Mr. Dawson, including the right to counsel. After that, the questioning proceeded as follows:

Detective: "Do you understand each of your rights?"

Dawson: "Yeah, definitely. I just wish that I'd memorized my lawyer's number. He's in my phone. **Is it possible for me to like call him or something**?"

Detective: "**Do you want your lawyer here?**"

Dawson: "Right now?"

Detective: "Yeah."

Dawson: "**If I could get a hold of him 'cause I don't know his number; it's in my phone**."

Detective: "OK."

Dawson: "But you could still tell me what's going on though, right?."

Detective: "No, **I can't talk to you if you if you want your lawyer here and you already said you did, so let's, you know what, let's give him a call**."

Dawson: "And if he don't answer then can you come talk to me?"

Detective: "No."

Dawson: "So what happens if he don't answer?"

Detective: "Ah, I mean, we'll, we'll deal with that if it happens. Let's hope he answers. I mean, from the sound of it, **it sounds like you understand your Miranda rights and you want your attorney**."

Dawson: [Inaudible]

Detective: Is that, am I understanding that correctly?"

Dawson: "Well, yeah, I just, to be honest I just really want to know what's going on, you said something about [not discernable], you know, I don't know what the hell happened, what incident happened. I just really want to know what's going on. That's pretty much it."

Detective: "OK."

Dawson: "That's all."

Detective: "OK. So just hang, hang tight for a minute, OK? **We'll get your phone, we'll go from there.**"

At that point, the detective left the interrogation room, purportedly to get Mr. Dawson's phone so he could call his lawyer. I have highlighted portions of the questioning to show not only that Mr. Dawson clearly asked to contact his lawyer, but also that the detective plainly expressed his understanding that Mr. Dawson had asked for counsel to be present "right now." As I explain below, once Mr. Dawson invoked his right to counsel, it is legally impossible for him to change his mind unless is lawyer is present when he does so.

What happened next, though, is that Mr. Dawson was not given his phone, was not given any means to contact counsel, and no one attempted to contact his counsel on his behalf. Instead, less than two minutes later, when the detective next entered, he sat down and said, "Here's the deal, I'm just going to ask you flat out, because we're in the middle of this and this is something we could potentially resolve – do you want your lawyer here or do you want to just figure this out?" Mr. Dawson replied, "I really just want to figure this out." The detective administered *Miranda* warnings again and Mr. Dawson agreed to speak to police. The detective then began to question Mr. Dawson about the interaction he

had with the victim, which Mr. Dawson initially adamantly maintained was consensual. Eventually, after the detective repeatedly urged Mr. Dawson to tell the truth and suggested that if Mr. Dawson were to appear contrite, it may help his case, Mr. Dawson penned an apology letter to the victim.

Before trial, Mr. Dawson moved to suppress the letter and the statements he made at the police station. The suppression court denied the motion, holding that Mr. Dawson's request for counsel was equivocal and that he voluntarily and knowingly waived his rights. A jury found Mr. Dawson guilty of sexual abuse in the first degree and he was sentenced to 7 years' incarceration and 10 years' post-release supervision. The Appellate Division affirmed the conviction on the ground that "when the detective asked defendant if he wanted his attorney present, defendant was vague, never respond[ing] affirmatively or negatively" (195 AD3d 1157, 1158-1159 [3d Dept 2021]). The court explained that "[a]t no time did the defendant request his counsel to be present and he acted in a manner consistent with a desire to fully and frankly cooperate in providing information to the detective" (*id.* at 1159). Mr. Dawson appeals.

II.

The right to counsel in New York is robust and one our court has vigilantly guarded (*see Cunningham*, 49 NY2d at 207). Indeed, although "[t]he Right to Counsel Clause in the State Constitution is more restrictive than that guaranteed by the Sixth Amendment to the United States Constitution (*compare*, NY Const, art I, § 6, *with* US Const 6th, 14th Amends)…by resting the right upon this State's constitutional provisions guaranteeing the privilege against self-incrimination, the right to assistance of counsel and due process of

law we have provided protection to accuseds far more expansive than the Federal counterpart" (*People v Bing*, 76 NY2d 331, 338 [1990]; *see also People v Settles*, 46 NY2d 154 [1978]). A key example is our requirement that a suspect in a criminal matter, even one not yet charged or arraigned, who requests representation may not be questioned further in the absence of an attorney (*Cunningham*, 49 NY2d at 205, 207). By extension, a suspect who has invoked the right cannot voluntarily waive the right to counsel without an attorney present (*id.* at 205). That rule, among other strictures of this State's right to counsel, "breathe[] life into the requirement that a waiver of a constitutional right must be competent, intelligent and voluntary" (*People v Hobson,* 39 NY2d 479, 484 [1976]).

For New York's "indelible" right to counsel to attach, "the invocation of counsel by an uncharged defendant…must be unequivocal" (*People v Mitchell*, 2 NY3d 272, 276 [2004]). Whether a request "is or is not equivocal" is a mixed question of law and fact "that must be determined with reference to the circumstances surrounding the request including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant" (*People v Glover*, 87 NY2d 838, 839 [1995]). Reviewing an Appellate Division determination of a mixed question of law and fact, we look only for support in the record; "[w]hen there is support in the record…the issue is beyond further review by this Court" (*People v Porter*, 9 NY3d 966, 967 [2007]).

A request for counsel is equivocal when it is "unambiguously negated" at the same time that it is asked (*People v Glover*, 87 NY2d 838, 839 [1995]), or when the request is posed as a question such as "[s]hould I speak to a lawyer" (*People v Hicks*, 62 NY2d 969, 970 [1987]). Similarly, a suspect's mention of lawyer or "suggest[ion] to the police that

[the person] might consult a lawyer" is equivocal (*People v Rowell*, 59 NY2d 727, 730 [1983]). Nor, finally, is a mere suggestion "that counsel might be desired" sufficient to unequivocally invoke the indelible right to counsel (*Mitchell*, 2 NY3d at 276) [holding a mother's mention of her son – the suspect's – lawyer did not unequivocally inform the police of his request for counsel]).

However, an unequivocal request does not require "magic words" (*Mitchell*, 2 NY3d at 276). We have found statements to police to be unequivocal even when suspects have used conditional language or spoken without absolute confidence about their desire for representation. In *People v Harris*, we upheld the Appellate Division's determination that the defendant's statement "*I think* I want to talk to a lawyer" was unequivocal (93 AD3d 58, 60 [2d Dept 2012] [emphasis added], *affd* 20 NY3d 912 [2012]). In *People v Esposito*, the defendant told police, "I *might* need a lawyer" (68 NY2d 961, 962 [1986] [emphasis added]). We held the statement "constituted a request for counsel" (*id.*). Finally, in *People v Porter*, we reversed the Appellate Division's determination that the defendant's statement to police "*I think* I need an attorney" was insufficient to unequivocally inform the police of his desire for counsel, determining the record could support no other reasonable interpretation of the request (*People v Porter*, 9 NY3d 966, 967 [2007] [emphasis added]).

The Appellate Division has distilled this inquiry to a determination of whether a reasonable police officer in the circumstances would understand the statement to be a request for an attorney, which we have approved (*see e.g. Harris*, 93 AD3d at 62, *affd* 20 NY3d 912 [2012]). Although this is an "objective" test, we have considered the reaction of

law enforcement to a defendant's statement or to similar language as strong record evidence a request was or was not unequivocal (*see e.g.*, *Porter*, 9 NY3d at 967 [weighing that the interrogating officer had made a note that the defendant was requesting an attorney]). Indeed, in *Harris*, we upheld the Appellate Division's finding that the defendant's request was unequivocal, in which the court noted "*crucially*, [the investigating officer] clearly understood what the defendant was requesting, as evidenced by the fact that he terminated the interview" (*Harris*, 93 AD3d at 69 [emphasis added]).

Here, Mr. Dawson unequivocally invoked his right to counsel – the record supports no other conclusion. As is clear from the quoted portion of the colloquy with the detective, he twice said he wanted to call his lawyer, and the detective twice expressly stated that he understood Mr. Dawson had asked to call counsel and therefore the detective could no longer speak to Mr. Dawson. Additionally, the detective then told Mr. Dawson to wait while the detective retrieved Mr. Dawson's phone so he could call counsel.

Mr. Dawson's statements do not inquire if having a lawyer would be a good idea, nor do they merely inform the police that Mr. Dawson may consult a lawyer or that he has a lawyer retained for a different matter (*cf. Rowell*, 59 NY2d at 730; *Hicks*, 62 NY2d at 970; *Mitchell*, 2 NY3d at 276). Rather, in response to being read his *Miranda* rights, and asked if he understood those rights, Mr. Dawson said that he had a lawyer and asked if it would be possible to call that person, whose number was located in his (confiscated) personal phone. Moreover, as in *Porter* and *Harris*, in which the interviewing police officers documented their understanding that the defendants had unequivocally requested counsel, here the interrogating detective twice stated that he understood Mr. Dawson to be

invoking his right to counsel and told Mr. Dawson he was suspending the interrogation to retrieve Mr. Dawson's phone to enable a call to counsel. Finally, Mr. Dawson's interest in knowing what was going on, particularly why he had been detained, and for how long he would be kept at the police station just hours before he was expected at work, does not in any way diminish the clarity of his request for counsel: a defendant can simultaneously want to know the charge against him and to be represented by counsel.

Nor does Mr. Dawson's phrasing render his request for counsel equivocal. In the days before cellular phones, if Mr. Dawson had said, "If I could get a hold of him by using one of your phones," or "if you would allow me to call him," we could hardly conclude that Mr. Dawson was suggesting that he did not really *want* to contact his lawyer – just that he was unsure if he *would be allowed* to. Likewise, Mr. Dawson's phrasing of his reiterated request as "is it possible for you to like call him or something" does not indicate any lack of desire to call his lawyer, but rather a lack of certainty about whether he could contact the lawyer directly or perhaps the police would have to make the initial contact for him. His phrasing is less equivocal than the phrasing we have previously held unequivocal in *Harris,* where the defendant said "I think I want a lawyer" – which suggests some uncertainty about the desire to contact a lawyer, not the practical ability to do so (93 AD3d at 60). Similarly, we held the request in *Esposito* unequivocal even though the defendant said "I might need a lawyer" (68 NY2d at 962), which again expresses some uncertainty about the defendant's desire for representation – not his concern that he might not be allowed or able to contact the lawyer. If the conditional language in those cases was

insufficient to render the request equivocal, *a fortiori* Mr. Dawson's statements here are unequivocal.

The context of Mr. Dawson's statement is also germane to determining its clarity. Mr. Dawson phrased his first request in response to the detective's reading of *Miranda* warnings that expressly identified Mr. Dawson's right to counsel, followed by the detective's query as to whether Mr. Dawson understood each of those rights. Mr. Dawson's first response is wholly unambiguous in context. The *Miranda* warnings did not address the situation in which he found himself: he had a lawyer, wanted to contact the lawyer, but had not memorized his lawyer's phone number and the only means he had of accessing it was in his personal phone, which the police had confiscated. How else could he inquire as to the possibility of exercising his right other than to first ask if he could call his lawyer and then, having not received a direct response to that question, ask if the police could call for him, using the number found in his personal phone? Under our settled caselaw and any colorable view of the interrogation video, Mr. Dawson's request for counsel was clear, and no waiver outside of counsel's presence could occur.

### III.

There is a further reason why the evidence obtained through interrogation of Mr. Dawson should be suppressed. The interrogation here "vitiated or at least neutralized the effect" of the *Miranda* warnings issued to Mr. Dawson (*People v Dunbar*, 24 NY3d 304, 316 [2014]). In *Dunbar*, we held invalid a practice in in which police would, in pre-arraignment interviews, in addition to the administration of normal *Miranda* warnings, provide a preamble (24 NY3d 304, 308 [2015]). The preamble informed individuals this

was their "opportunity to tell [their] story" and the only chance to do so before going before a judge (*id.* at 308). We held such a preamble "undermined the subsequently-communicated *Miranda* warnings to the extent that [defendants] were not adequately and effectively advised of the choice the Fifth Amendment guarantees against self-incrimination . . . before they agreed to speak with law enforcement authorities (*id.* at 308, citing *Missouri v Seibert*, 542 US 600, 611 [2004], quoting *Miranda*, 384 US at 467 [internal quotation marks omitted]).

The interrogation here offends *Dunbar*'s rule; indeed, the practice here is worse than the one we disapproved there. In *Dunbar*, the hortatory preamble was given before the *Miranda* warnings, thus raising the possibility that the warnings had been diluted. In such a circumstance, it would be impossible to know whether, had the warnings been given correctly, what the defendant would have chosen to do. Here, in contrast, the warnings were given correctly without preamble – and we know that Mr. Dawson chose to invoke his right to counsel. Only after he had done so twice, and only after the detective had twice expressly acknowledged that Mr. Dawson had done so, and then told Mr. Dawson that he would be allowed to call counsel, did the detective then launch into the exhortation we found unconstitutional in *Dunbar*. That is, where the improper exhortation in *Dunbar* might have polluted the *Miranda* warnings, here, it decidedly did.

Mr. Dawson's interrogation bears several hallmarks of police practices meant to induce the interrogee into making incriminating statements in derogation of the Fifth Amendment and New York Constitution's right to counsel, self-incrimination and due process guarantees. First, Mr. Dawson was left isolated in a small room, one leg shackled

to a chair, with no information. As the U.S. Supreme Court noted in *Miranda,* reviewing a police instruction manual at the time, a major goal of police interrogation is to psychologically manipulate the suspect, largely by isolating the person from friends and family and familiar settings and speaking to them alone (*Miranda v Arizona*, 384 US 436, 449 [1966]). Although not illegal, the detention set the scene for the proceeding conduct and increased its impact.

Second, the detective, rather than scrupulously adhering to what he clearly perceived to be a request for counsel by ceasing all questioning, continued to ask Mr. Dawson if he wanted a lawyer. When Mr. Dawson first asked if the police could call his lawyer, rather than answering the question, the detective responded by asking again: "Do you want your lawyer right now?" After telling Mr. Dawson that he would retrieve his phone so that Mr. Dawson could speak to his lawyer, the detective returned less than two minutes later, saying: "Here's the deal, I'm just going to ask you flat out, because we're in the middle of this and *this is something we could potentially resolve* – do you want your lawyer here or do you want to just figure this out?" The effect of the repeated questioning about Mr. Dawson's desire for counsel, even though the officer separately and repeatedly affirmed that he understood Mr. Dawson to want his attorney, clearly communicated to Mr. Dawson that he would be better off were he to go forward without his attorney. The detective's statement that "this is something we could potentially resolve" – after having confirmed Mr. Dawson's request to contact his counsel – is particularly concerning. The statement implied that Mr. Dawson, if he were to abandon his right to counsel, might be able to very quickly settle the matter without issue. Of course, nothing could be farther

from the reality of police interrogation in general[2] or this interrogation in particular – after Mr. Dawson agreed to answer questions in order to "know what's going on" the detective proceeded to interrogate him for a length of time before communicating the reason for his arrest.[3] The detective's general willingness to communicate to Mr. Dawson what might best help his case is fully evident from the entirety of the interview, but particularly when the detective suggested to Mr. Dawson that writing an apology letter to the victim would be in his best interest. As the detective explained at the suppression hearing, he did not require Mr. Dawson to write the letter, but "I told him that it is all in how you handle what happens, and that if he is sincere that could potentially benefit him." Particular in a case such as this, where the sole issue was whether the sexual act was consensual, this is exactly the type of false legal advice the *Miranda* court sought to curb and that any lawyer would have advised immediately against (*Miranda*, 384 US at 455 ["When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice"]). This type of practice is a reason *Miranda* warnings and the exclusionary rule exist.

IV.

---

[2] *See generally* James Duane, You Have the Right to Remain Innocent: What Police Officers Tell Their Children About the Fifth Amendment (Little A, New York, 2016).

[3] The detective's subsequent imploring of Mr. Dawson to just tell the truth and work with him bears striking similarity to other police strategies described in *Miranda*, quoting the police manual: "The interrogator should respond by suggesting that the subject first tell the truth to the interrogator himself rather than get anyone else involved in the matter….The interrogator may also add, 'Joe, I'm only looking for the truth, and if you're telling the truth, that's it. You can handle this by yourself'" (*Miranda*, 384 US at 454).

Mr. Dawson unequivocally requested counsel. The detective repeatedly stated that he understood Mr. Dawson to have requested counsel. Why doesn't the majority? I have no good answer, only an observation. Today's holding is like several others in which our Court has imposed a high and unrealistic linguistic burden on criminal defendants – where the intent is clear, but some better choice of words can be imagined, often finding ambiguity in deferential language. For example, in *People v Silburn*, the Court upheld the Appellate Division's finding that a defendant's statement to the trial court "I would like to know if I could proceed as pro se" as equivocal because the defendant *also* requested a lawyer be available as an aide (31 NY3d 144, 162 [2018, Wilson, J, dissenting]). In *People v Duarte*, the Court again interpreted the defendant's statement "I would love to go pro se," despite abundant clarity, as insufficiently clear and unequivocal (37 NY3d 1218 [2022]. In *People v Brown*, the Court held the defendant's agreement to waive his right to appeal waived his right to speak at sentencing, despite his clear requests to do so – "Am I going to get a chance to talk?" (37 NY3d 940, 941, 943 [2021, Wilson, J., dissenting]). Despite our eschewing the need for "magic words" in theory, we seem to require them in practice.

The Court's failure construe defendants' speech in a commonplace, contextualized, or even reasonable manner misapprehends the animating concerns behind our state's expansive guarantees of the privilege against self-incrimination, right to counsel and due process. Our hallmark right to counsel cases show deep recognition of the fear and intimidation inherent in police interrogation and investigation. We have noted that the rights we have recognized in this state not only "preserve the civilized decencies,

but…protect the individual, often ignorant and uneducated, *and always in fear*, when faced with the coercive police power of the State" (*Hobson,* 39 NY2d at 485 [emphasis added]). When we announced the rule that an uncharged suspect could invoke the indelible right to counsel, we explained the right was grounded in our desire to guard against waiver of important constitutional rights "out of ignorance, confusion or *fear*" (*Cunningham*, 49 NY2d at 207 [emphasis added]). It is tragic to develop such a beautifully justified constellation of rights – one meant to offset the fear an individual subject to the coercive power of the state must inevitably feel – only to dim them because fear affected a person's speech. And when it is not fear that shapes a defendant's word choice, it is often the custom of using the conditional tense when speaking to those in power: adopting a more deferential tone with a trial court or the police officers in whose control a defendant's liberty and immediate safety rests may be advantageous.

Penalizing criminal defendants for fearful or deferential speech that otherwise clearly articulates their desires is detrimental for those individuals, but also damages the integrity of the justice system as a whole. We have recognized:

> "the assistance of counsel is essential not only to insure the rights of the individual defendant but for the protection and well-being of society as well. The right of any defendant, however serious or trivial his crime, to stand before a court with counsel at his side to safeguard both his substantive and procedural rights is inviolable and fundamental to our form of justice" (*Settles*, 46 NY2d at 161).

Indeed, "[t]he danger is not only the risk of unwise waivers of the privilege against self incrimination and of the right to counsel, but the more significant risk of inaccurate, sometimes false, and inevitably incomplete descriptions of the events described" (*Hobson*,

39 NY2d at 485). Those very concerns led to the initial adoption of *Miranda* warnings at the Federal level (*see Miranda*, 384 US at 455 n 24 [noting the link between police interrogations and false confessions]).

The People argue that if our Court were to recognize Mr. Dawson's request that police call his lawyer as what it was – a request for his lawyer – the rule would mark the end of police interrogation. If so, that would transpire only because any competent lawyer would have told Mr. Dawson to remain silent, as is his constitutional right. This Court has the power to advance police interrogation by eroding, and eventually wiping away, the right to counsel, but should we?

On review of submissions pursuant to section 500.11 of the Rules, order affirmed.
Chief Judge DiFiore and Judges Garcia, Singas, Cannataro and Troutman concur.
Judge Wilson dissents in an opinion, in which Judge Rivera concurs.

Decided April 26, 2022