OPINION OF THE COURT
Steven L. Barrett, J.
On October 1, 2012, the court found that there was legally sufficient evidence presented to the grand jury establishing that on December 23, 2011, defendant, a New York City correction officer assigned to the K-9 unit, assaulted Regelio Esteris in the visitor’s room of the George R. Vierno Center (GRVC) on Rikers Island and attempted to cover up the assault by filing false reports regarding the incident. Based on this evidence, defendant stands indicted for assault in the third degree, offering a false instrument for filing in the first and second degrees, falsifying business records in the first and second degrees, official misconduct and related charges. In its October 1, 2012 decision, the court granted a Huntley hearing with respect to a statement made by defendant on May 9, 2012 to three employees of the New York City Department of Investigation (DOI) who were assigned to investigate the December 23, 2011 incident. On October 27, 2014, on consent of the People, the court expanded the Huntley hearing to include a determination as to whether defendant’s statement was compelled and thereby immunized from use in the instant criminal prosecution. After a hearing held on November 24, 2014, in a published decision dated February 17, 2015, the court denied defendant’s motion to suppress said statement. (See People v Grabowski, Sup Ct, Bronx County, Feb. 17, 2015, Barrett, J., indictment No. 2048/12.) Based upon new information that came to light after the court’s decision was rendered, the court reopened the hearing and has now heard evidence from additional witnesses, including the defendant. Based upon all of the evidence from the initial hearing and the reopened hearing, defendant’s motion to suppress is granted and the court’s February 17, 2015 decision is withdrawn and superseded by this decision and opinion.
*188 At the initial hearing to determine if defendant’s statement was compelled, DOI Deputy Inspector General Louis Stephan Zander was the sole witness. Zander testified credibly to the following facts:
On May 8, 2012, the day prior to the taking of defendant’s statement, Zander called defendant’s commanding officer, Captain Reginald Patterson, and arranged with Patterson to interview defendant the following day on Rikers Island in the training trailer used by the K-9 unit. On May 9, 2012, at approximately 1:30 p.m., Zander, accompanied by Correction Officer Rhonda Young and Captain Vincent Valerio (both of whom were assigned by the Department of Correction to DOI), met defendant at the K-9 training trailer. The room in the trailer where the interview took place was approximately 20 feet wide by 15 feet long, and the door to the room was unlocked. Zander, Young, and Valerio each introduced themself to defendant and then Zander asked defendant if he would be willing to talk about what happened on December 23, 2011 in the GRVC building. Defendant appeared eager to discuss the incident and said, “sure.” At the outset of the interview defendant’s face appeared flush, his hands were trembling and his voice was shaky. The interview lasted one hour and 20 minutes. Unbeknownst to Zander, Young surreptitiously recorded part of the interview on her BlackBerry cell phone.
Prior to the interview, neither Zander, Valerio, nor Young informed defendant that he was the subject of the investigation and that he had to answer their questions. None of the investigators told defendant that a refusal to answer their questions would result in disciplinary action by the Department of Correction (DOC), including termination.[1] Conversely, none of the investigators told defendant that he did not have to talk to them, that he was free to leave, or that there would not be any adverse consequences if he elected not to speak to them. At no point prior to or during the interview did defendant ask the investigators if he had to answer questions or if there would be any negative consequences, such as being fired, for refusing to answer their questions. Defendant never asked if he needed a union representative or an attorney to represent him.[2]
*189 Zander also testified regarding his knowledge of the procedures utilized when DOI conducts an interview pursuant to Mayor’s Executive Order (MEO) 16 § 4 (b). This provision states in pertinent part that DOI may require any employee or officer of New York City to answer questions concerning any matter related to the performance of their official duties, after first being advised that neither their statements nor any information or evidence derived therefrom will be used against them in a subsequent criminal prosecution other than for perjury or contempt arising from such testimony. The refusal of an employee to answer questions shall constitute cause for removal from employment or other appropriate penalty. (See People’s exhibit 5.) According to Zander’s initial testimony, in those instances when DOI seeks to interview someone pursuant to MEO-16, the procedure that is followed is: (1) a decision is made by supervisors at DOI whether to authorize an MEO-16 interview; (2) an appearance notification, which gives the witness or subject 48 hours’ notice of the interview, is sent to the witness or suspect informing the individual that he is being ordered to attend an interview and also informs him of his right to representation by an attorney (see People’s exhibit 4 at 1); (3) the proceeding is conducted at DOI headquarters in downtown Manhattan at 80 Maiden Lane; (4) at the outset of the proceeding, the witness is sworn, and if he is given use immunity, he is informed that any statements made during the interview or any information or evidence derived therefrom cannot be used in a criminal prosecution other than for peijury or contempt arising from the testimony, and that if he refuses to answer the questions, that refusal shall constitute cause for removal from employment or other appropriate penalty.
Zander testified that none of these procedures were followed in this case, and purposely so. According to Zander, because defendant was the subject of the investigation, the investigators did not want to confer immunity upon any statement he might make. Thus, defendant was not sent an appearance letter, was not examined under oath, was not informed that he could consult with an attorney or union representative, was interviewed in the field rather than at 80 Maiden Lane, and received *190 no recitation of rights and warnings. Specifically, Zander stated that defendant was not threatened with termination if defendant refused to answer the investigators’ questions. When asked what the consequences would have been if defendant had refused to answer their questions, Zander testified, “we would have left,” and he would not have referred defendant for disciplinary proceedings based upon his failure to cooperate. Zander’s position was that this interview was not pursuant to MEO-16, and that DOI reserved the option of interviewing a target/officer either as an MEO-16 hearing or as a field interview subject to no protections, but also subject to no penalties for noncooperation.
At the conclusion of the interview, defendant left the trailer, unaccompanied, and retrieved some medical documentation from his vehicle, which he gave to the investigators, and then left the trailer. Defendant was not handcuffed at any time during the interview and was not arrested until July 16, 2012. On July 23, 2012, the DOC Office of Trials and Litigation (OTL) brought administrative (non-criminal) charges against defendant based upon the December 23, 2011 incident and defendant’s May 9, 2012 statement. Administrative charge number three, which was based upon defendant’s May 9, 2012 statement, originally charged defendant with making false and misleading statements “during a MEO-16 interview.” (See People’s exhibit 4.) Sometime in the summer of 2014, Assistant District Attorney (ADA) Peter Kennedy informed Zander of the administrative charges, including charge number three. Prior to this conversation with ADA Kennedy, Zander was unaware that administrative charges had been brought against defendant. Zander then informed Martha Ibis-Blake, an attorney with OTL, that the May 9, 2012 interview of defendant was not conducted pursuant to MEO-16, but rather was a field interview. Subsequent to this conversation with Ibis-Blake, Zander learned that administrative charge number three was amended to read that defendant’s alleged false and misleading statements were made “during an interview” concerning his interactions with a visitor on December 23, 2011.[3]
Based on Zander’s initial testimony, the court concluded that defendant’s May 9, 2012 statement was not compelled because *191 it lacked any of the essential hallmarks of an MEO-16 interview insofar as defendant was not sent a letter directing him to appear at DOI headquarters at 80 Maiden Lane; defendant was not given an oath and sworn as a witness; defendant was not advised that he could have an attorney or union representation present; defendant was not warned of the consequences of a refusal to answer the investigators’ questions; and defendant was not interviewed at DOI headquarters in lower Manhattan, but rather the interview took place on Rikers Island. (See People v Grabowski, Sup Ct, Bronx County, Feb. 17, 2015, Barrett, J., indictment No. 2048/12.) For these reasons, the court concluded that “there is nothing in the record to support defendant’s contention that the May 9, 2012 interview falls within the ambit of MEO-16 or that defendant had a reasonable basis to believe he was being subjected to a MEO-16 interview.”[4] (Id.) Thus, the court determined that defendant’s statement was not entitled to use immunity and denied defendant’s motion to suppress.
On March 18, 2015, a date the case was scheduled for trial, Assistant District Attorney Peter Kennedy apprised the court that he had been informed by Zander that MEO-16 hearings can occur and have occurred in settings other than 80 Maiden Lane and that there is no legal requirement that they occur there. As stated above, underpinning the court’s February 17, 2015 decision was its belief that there was a relatively bright-line between a formal MEO-16 interview, at which any correction officer would reasonably believe he would be afforded use immunity for any statements he made to investigators, and an informal field interview, at which no correction officer could reasonably believe he was being afforded use immunity for any statements he made to investigators. Upon being apprised of Zander’s corrected information regarding the broader range of possible settings for MEO-16 interviews, the court perceived that what had been described as a clear demarcation was in fact somewhat blurred, that there might well be other aspects *192 in which the distinction was blurred, and that one of the fundamental premises of the initial decision was called into question. Certainly, the fact that defendant’s interview occurred at Rikers Island, which was viewed as a significant indicia that the MEO-16 protections were inapplicable in the court’s original decision, was no longer a determinative factor. Thus, the court reopened the hearing to correct the record and to afford both parties the opportunity to present further evidence regarding the nature of the proceedings held and the underlying issues of whether defendant had a subjective belief that his statement was made under compulsion and whether any such belief was objectively reasonable.
At the reopened hearing, the People presented three witnesses: Zander; Maria Mostajo, formerly the Associate Commissioner of DOI; and David Dueño, the Deputy Director of Investigation for DOC. In addition, defendant testified in his own behalf. The People’s witnesses testified at length with respect to DOI’s and DOC’s general interview techniques, as well as the specifics of defendant’s interview, the training received by all correction officers, and the relationship between correction officers and the correction officers union (COBA). While much of the testimony regarding DOFs interview techniques rehashed Zander’s earlier testimony some new relevant information came to light. In general, much of the new téstimony contributed to the conclusion that, by reason of the various perspectives of the numerous parties involved, the lines between compelled statements and those outside the MEO-16 process were often blurred, and that the clear uniformity that had been posited at the initial hearing before the court was illusory.
Zander and Mostajo both described in detail three types of interviews that are conducted by DOI. First, there is the field interview, which Zander described as an interview where an investigator goes into the field and conducts an interview at a correction officer’s home or place of business. These interviews are not done on notice to the interviewee, not recorded, and not done under oath. Interviewees are not apprised of their right to counsel or to have a union delegate present and are not offered use immunity for their statements.[5] Mostajo explained that because use immunity is not conferred during a field *193 interview, they are most often utilized with respect to subjects or targets of an investigation where the goal is to get a statement from the officer that can be used in a criminal prosecution, which, she added, is easier to do when an attorney or union representative is not present. If a correction officer elects not to speak with an investigator, the field interview is over and the investigator is trained not to persist in questioning, but to leave a card and tell the officer to call her if he changes his mind. A correction officer cannot be fired or disciplined for refusing to answer an investigator’s questions during a field interview, but subjects are not told that they are subjects or targets of the investigation. When asked, “how would a correction officer know, if he’s approached in the field and he’s asked to give a statement, that he could not be terminated for refusing to answer questions,” Mostajo responded, “[T]hat’s a tough question, I’m not sure how they would know other than my understanding is that all city employees are given a copy of MEO-16” and that there is “routine training at the agencies with respect to [an employee’s] obligation to report corruption and criminality to the Inspector General.” (Tr at 194.)
The second and third interview techniques utilized by DOI investigators are what Zander and Mostajo characterized as voluntary statements on notice and compelled MEO-16 statements. In each of these instances, a correction officer is sent notice, which directs him to appear at 80 Maiden Lane and advises him that he may bring counsel with him. However, both Zander and Mostajo testified that either type of interview may occur anywhere and even may be held at Rikers Island.* ***[6] Upon appearing for a voluntary interview or a compelled MEO-16 interview, defendant is read a “litany,” which starts off with a “preamble” in which the interviewers first introduce themselves and the interviewee is apprised of the reason for the interview. An oath is then administered to the interviewee. The interviewee is then informed of his Fifth Amendment right against self-incrimination and told that if he invokes it, then there will be no adverse consequences such as dismissal or *194 suspension for having invoked it. If, at this juncture, the interviewee elects not to invoke his Fifth Amendment privilege and to speak with the investigators, his statement is considered by DOI to be a voluntary statement on notice. However, if the interviewee chooses to invoke his Fifth Amendment privilege, DOI then determines (somewhat inconsistently with their initial advice to the subject) whether to allow the target to withdraw with impunity or whether to proceed with the interview with use immunity then conferred and responses by the interviewee compelled upon threat of termination.[7] If DOI decides not to confer use immunity, then the interview ends and no adverse consequences attach. Thus, only if DOI decides to expressly confer use immunity, which occurs only after a target asserts a Fifth Amendment right, will the statement become a compelled MEO-16 statement.[8]
According to Mostajo, correction officers are trained to understand the difference between field interviews and compelled MEO-16 or voluntary interviews. At the correction officer academy, cadets are given a copy of all the rules and regulations of DOC, which includes MEO-16, and a certain amount of time is designated to review MEO-16. All cadets are *195 responsible for knowing all the rules and regulations of DOC.[9] Additionally, Dueño testified that correction officers are instructed early in their careers to reach out to union delegates whenever they are questioned by a superior officer or an investigator. Dueño also testified that correction officers are given cards by their union representatives with the words of the lofty-sounding “Weingarten Declaration” imprinted upon them. In substance, the card instructs the officer to request to have a union representative present prior to speaking with a supervisor or investigator about an on-the-job incident. (See exhibit 10.) Once again, we see a process that, depending upon the perspective of the participants, lacks the consistency with respect to the provision of rights that has long been the objective of criminal procedure. Thus, there is the conflict between the advocates for “lawyering up” and the consequent noncooperation “on advice of counsel,” and the worthy goal of forcing the cooperation by public servants in investigations into official misconduct via the employment of use immunity but which is frustrated by what might be described as inadequate or conflicting information.
Defendant testified that he had been a correction officer since 2000 and had been assigned to the K-9 unit since 2006. On the day of the interview, May 9, 2012, defendant recalled that contrary to the usual and uniform practice, all of the other correction officers who were assigned to the K-9 unit were sent out on assignments to distant posts, and that he was left alone with Captain Patterson and assigned to inventory narcotics that had been seized and were stored in a safe in the K-9 unit training trailer. Just as soon as he opened the safe, three individuals walked into the trailer. According to defendant, Captain Patterson told him that he had to speak with these three individuals. The three individuals, Zander, Young and Valerio, introduced themselves and displayed their official shields. Defendant recognized Valerio as a corrections captain that he had seen on Rikers Island, and Valerio, who was wearing his shield around his neck, introduced himself as Captain Valerio. Zander explained what they were there to talk to him about and started to ask him questions regarding the December 23, 2011 incident.
As he had never been disciplined before, this was the first time defendant had been interviewed about an on-the-job *196 incident. Defendant recalled being very nervous. Defendant spoke very fast and rambled and Young asked him to start over and to tell them exactly what happened. Defendant did not believe he was the subject of the investigation because he believed he had been assaulted by the visitor, and he was upset that the paperwork for the visitor’s arrest had not yet been processed. It was only at the end of the hour-long interview that, much to his surprise, defendant was informed that he was the subject of the investigation and that he was being accused of using excessive force against the visitor. Because he believed he had done nothing wrong and was not told he was the subject of the investigation until the end of the interview, and because he had never before been in trouble in connection with his official duties, defendant did not know to call, or believe he needed to call, a union representative or an attorney. Defendant did not possess a card with the telephone number of a union representative and he was unaware of the Weingarten declaration card.
Finally, defendant testified that because DOC is a paramilitary organization, he believed any time a correction officer is questioned by a superior officer or an investigator about his or her official duties, the correction officer could not invoke the Fifth Amendment and had to answer the questions posed.[10] Because Captain Valerio was present during the questioning, and because Captain Patterson was present just prior to the questioning, defendant was under the impression this was an MEO-16 interview and that if he failed to answer the investigators’ questions he could be fired, suspended, or otherwise disciplined. Defendant also believed that any statements he made would be afforded use immunity.* [11] Defendant, however, did admit that Zander never said that he had to answer the investigators’ questions and that he never asked Zander whether he could be fired if he refused to answer.
*197 Conclusions of Law
It is by now axiomatic that a state or municipality cannot present an employee with the Hobson’s choice of either making an unimmunized statement implicating criminal conduct or suffering a severe penalty such as termination. (See Garrity v New Jersey, 385 US 493, 498 [1967]; Matter of Matt v Larocca, 71 NY2d 154, 159-160 [1987].) Stated another way, under both the State and Federal Constitutions, a statement made under the threat of dismissal is deemed compelled; it is protected by the privilege against self-incrimination and automatically immunized from use in a subsequent criminal prosecution. (See People v McLean, 128 AD3d 1094 [2d Dept 2015]; People v Smith, 29 AD3d 1035, 1037 [3d Dept 2006].) There are two tests utilized by the courts of New York to determine what constitutes a compelled statement: (1) a defendant must establish that he was explicitly made aware that he would be fired for refusing to answer questions posed by investigators; or (2) a defendant must establish that he subjectively believed that termination would follow an assertion of his Fifth Amendment privilege and that that belief was objectively reasonable under the circumstances. (See People v McLean, 128 AD3d at 1096-1097, citing United States v Indorato, 628 F2d 711, 716-717 [1st Cir 1980] [for test one], and United States v Friedrick, 842 F2d 382, 395 [DC Cir 1988] [for test two].)
In New York City these constitutional principles have been codified in MEO-16, which affords an officer or employee of New York City use immunity for any statements he or she makes during the course of an investigative interview that satisfies the formal procedural criteria of MEO-16, and particularly whenever he or she is threatened with dismissal for refusing to answer the investigator’s questions at such a proceeding. Based on the testimony at the reopened hearing regarding the varied settings that an MEO-16 hearing could take place and the possibility that use immunity could be conferred during a field interview, the court is now persuaded that the line between MEO-16 interviews and field interviews, in fact, is not bright, but rather is blurred. Therefore, when a correction officer is questioned by an investigator about his official duties outside of 80 Maiden Lane, his or her knowledge as to whether the interview is a compelled MEO-16 interview versus a voluntary field interview cannot be presumed or imputed. Thus, in each case where a correction officer makes a statement “in the field” (i.e., outside the circumstances of a *198 formalized MEO-16 hearing at 80 Maiden Lane), and where he has not been explicitly threatened with termination for a refusal to answer, the dispositive question is that of the Friedrick test: whether that correction officer had a subjective belief that the statement was compelled and whether any such belief was objectively reasonable. This requires a case-specific factual analysis.
Here, it is undisputed that defendant voluntarily agreed to speak with the investigators and that he was not explicitly threatened with termination of his employment as a correction officer or that he faced some other severe sanction if he refused to speak with the investigators. However, the record now supports defendant’s contention that he believed he was presented with a situation where he would be terminated if he asserted his constitutional privilege and that this subjective belief was objectively reasonable under the particular circumstances of this case.
Initially, the court finds that defendant testified candidly and in a straightforward manner. Specifically, the court finds credible defendant’s testimony that he believed he would be fired if he refused to speak with the investigators and that he believed that the interview was an MEO-16 interview in which he would receive use immunity for his statements. It is uncontested that defendant was never told by any of the investigators that he was free to leave and that he would face no consequences if he refused to speak to the investigators. Further, defendant’s demeanor of extreme nervousness during the course of the interview was that of an inexperienced interviewee who believed his job was at stake should he fail to cooperate. The fact that defendant spoke freely to investigators for over an hour and did not attempt to consult with an attorney or union representative is also indicative that he believed his statements could not be used against him in any subsequent criminal prosecution.[12]
Defendant’s testimony regarding his subjective beliefs was objectively reasonable under the particular circumstances of *199 this interview. Captain Patterson was present and alone with defendant when the three DOI investigators entered the trailer and began the interrogation. One of the questioners was a DOC captain, and in a paramilitary organization such as DOC, where cooperation with superiors is expected, defendant would reasonably believe he had no choice but to answer or be severely disciplined.[13] Indeed, Mostajo admitted that, notwithstanding training, a correction officer would be hard-pressed to discern when approached in the field by investigators whether he or she would be fired for refusing to speak with them. In addition, the signage at Rikers directing correction officers to report corruption as well as the fact that DOC (as distinct from DOI), when investigating administrative violations, always conducts MEO-16 interviews and confers use immunity, could lead a correction officer, when approached in the field by investigators, to believe that he had to either talk or be fired. Finally, the fact that the interview of defendant was recorded and that it was at first characterized by DOC as an MEO-16 interview stand in support of the reasonableness of defendant’s belief that the interview was a compelled MEO-16 interview at which his statement would be afforded use immunity.
Notwithstanding the court’s conclusion that suppression is required here, the court has not held that the MEO-16 proceeding is the exclusive means by which DOI may conduct investigatory interviews. The existence of this formal procedure does not explicitly or implicitly revoke the right of DOI investigators to conduct field interviews of persons of interest, including targets of an official investigation, without conferring use immunity. Although the DOI investigators were under no constitutional or statutory obligation to offer defendant use immunity prior to questioning him, the court also believes that it is good practice prior to questioning a target for the investigators to inform him that he is free to leave, that he may consult with an attorney or union representative, that he is not obliged to answer their questions, and that he would not be fired or disciplined as a result of any such refusal. The only consequence of such cautionary advice would be that targets would not unwittingly forgo their rights, which is the very point of the compelled statements case authority and of the adoption of MEO-16. Had defendant been so informed and continued with *200 the interview, the outcome of this hearing would have been different. But here, defendant was not so informed. The credible evidence established that defendant subjectively believed that he would be terminated if he refused to answer the investigators’ questions and that that subjective belief was objectively reasonable. Thus, defendant’s statement was compelled and cannot be used in the instant criminal prosecution.
Accordingly, defendant’s motion to suppress his statement is granted and a Kastigar hearing is ordered to determine whether the People used said statement or any evidence derived directly or indirectly from it in obtaining the instant indictment. The court’s decision dated February 17, 2015 is withdrawn.

. Zander admitted that based upon his investigation up to that point in time, defendant was the subject of the investigation.

. Defendant also was not Mirandized. Though this is not an issue in this case, to the extent that DOI has the right to conduct field interviews of *189 targets of a criminal investigation, an individual assessment must be made as to whether the DOI investigators are conducting custodial interrogation, and if so, targets must be Mirandized before questioning, notwithstanding that they might be an officer and the investigation concerns their actions in an official capacity.

. These allegedly false and misleading statements of May 9, 2012, are not the subject of any criminal charge against defendant in the nature of perjury. The only question before the court is whether those statements are admissible at trial on charges pertaining to defendant’s actions or the formal reports that he filed regarding the alleged assault of December 23, 2011.

. The court noted with regard to defendant’s claim that he had a subjective belief that the interview fell within the purview of MEO-16, that defendant presented no evidence in this regard as he did not testify at the initial hearing and did not present any witnesses. The court further found that the affidavit that defendant attached to his memorandum of law that purported to establish his belief that he was questioned pursuant to MEO-16 was not admissible as evidence on the instant motion and thus the court declined to consider it. (See CPL 710.60 [4] [all persons giving factual information at a hearing on a motion must testify under oath].)

. Zander and Mostajo admitted that it was theoretically possible to confer immunity during the course of a field interview if the investigator explicitly threatened the employee with termination if he or she refused to *193 answer questions; however, they added, because the investigator is supposed to get authorization from an executive-level supervisor prior to conferring immunity, the investigator would not be inclined to do so on her own and could be disciplined if she failed to get authorization first.

. Neither Zander nor Mostajo were aware of either type of interview occurring on Rikers, but were aware of these interviews occurring at the Bulova building in Queens where the Department of Correction, Investigation Division is located.

. The interviewee is then informed that
“neither any statements you make during this proceeding nor any information or evidence derived therefrom may be used against you in a subsequent criminal prosecution other than for perjury or contempt arising from your testimony. Because you have use immunity you must answer questions even if a truthful answer might tend to incriminate you. If you nevertheless refuse to answer my questions, your refusal shall constitute cause for removal from office or employment or other appropriate penalty.” (See exhibit 3 at 2.)

. This bifurcated procedure is problematic insofar as a correction officer is initially told that he can’t be disciplined for invoking his Fifth Amendment right, but then once invoked and immunity conferred, he is told that he can be disciplined for doing so. (Cf. People v Dunbar, 24 NY3d 304, 316 [2014] [statement inadmissible where a preamble was read to the defendants by a Queens assistant district attorney as the preamble was “at best confusing and at worst misleading,” rendering the subsequent Miranda warnings inadequate and ineffective in advising the defendants of their rights].) DOC does not utilize this procedure in their investigations of administrative violations. Indeed, according to Dueño, DOC does not do field interviews and conducts only compelled MEO-16 interviews where use immunity is always conferred. DOC, unlike DOI, does not bifurcate their warnings, and begins every interview with a statement or explanation of one’s constitutional rights and the provision of use immunity This difference in approaches to interviewing correction officers taken by DOC and DOI is significant insofar as it may impact upon a correction officer’s subjective belief that a particular interview is compelled.

. In addition, the People introduced directives of DOC which essentially parrot the above quoted language that is read to interviewees at the conclusion of the litany. (See People’s exhibits 8, 9.)

. Zander also testified that DOC is a paramilitary organization and that correction officers would feel some sense of obligation to answer questions posed by a superior officer regarding an on-the-job incident. (Tr at 128.)

. Defendant admitted receiving a copy of DOC rules and regulations, which included MEO-16, and the directives promulgated by DOC, but claimed he was not familiar with DOI or COBA procedures regarding questioning because, as a member of the K-9 unit, he rarely had contact with inmates, and because he had never before been questioned or disciplined. Also, Dueño admitted that most correction officers, including himself, do not have every department rule and directive memorized.

. Contrary to the People’s assertion that if defendant believed his statement was compelled he would have called an attorney or union representative, the court finds credible defendant’s explanation for not doing so—that he had never been interviewed before and that he was not informed that he was the subject of the investigation and had no reason to believe he was the subject. Also, the court finds credible that defendant was not aware of the specific procedures employed by DOI for MEO-16 interviews and that he was not aware of the so-called Weingarten declaration.

. Furthermore, because the People failed to call Captain Patterson as a rebuttal witness, the court credits defendant’s testimony that Patterson said that he had to speak to the investigators.